CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., Petitioner–Appellee,

v.

PEMEX–EXPLORACIÓN Y PRODUCCIÓN, Respondent–Appellant.

Docket No. 13-4022
August Term, 2014

United States Court of Appeals,
Second Circuit.

Argued: November 20, 2014

Decided: August 2, 2016

Catherine E. Stetson, Hogan Lovells US LLP, Washington, D.C.; on the brief: Dennis H. Tracey, III, Ira M. Feinberg, Hagan C. Scotten & Erin M. Meyer, Hogan Lovells US LLP, New York, NY; Richard C. Lorenzo, Hogan Lovells US LLP, Miami, FL, for Appellant.

Paul D. Clement (with Zachary D. Tripp & William R. Levi on the brief), BANCROFT PLLC, Washington, D.C.; also on the brief: Jeffrey S. Bucholtz & Brian Callanan, King & Spalding LLP, Washington, DC; Richard T. Marooney & Charles C. Correll, Jr., King & Spalding LLP, New York, NY, for Appellee.

Preet Bharara (with David S. Jones, Caleb Hayes-Deats & Emily E. Daughtry on the brief), United States Attorney for the Southern District of New York, for Amicus Curiae United States of America; also on the brief: Joyce Branda, Douglas N. Letter & Sharon Swingle, Civil Division, Department of Justice, Washington, D.C.; Mary E. McLeod, Department of State, Washington, D.C.

Erik S. Jaffe, Erik S. Jaffe, P.C., Washington, D.C., for Amicus Curiae The Government of the United Mexican States in support of Respondent–Appellant.

Peter B. Rutledge, Athens, GA, for Amicus Curiae The Chamber of Commerce of the United States of America in support of

Petitioner–Appellee; on the brief: Kathryn Comerford Todd & Tyler R. Green, National Chamber Litigation Center, Inc., Washington, D.C.

Before: WINTER, JACOBS, and RAGGI, Circuit Judges.

DENNIS JACOBS, Circuit Judge:

The truly unusual procedural history of this case requires us to reconcile two settled principles that militate in favor of opposite results: a district court's discretion to confirm an arbitral award, and the comity owed to a foreign court's ruling on the validity of an arbitral award rendered in that country, here, Mexico. Petitioner-appellee Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. ("COMMISA") contracted with respondent-appellant Pemex-Exploración Y Producción ("PEP"), a state-owned enterprise, to build oil platforms in the Gulf of Mexico. The contracts provided that arbitration would be the exclusive mechanism for dispute resolution. When the parties' relationship disintegrated, each side accused the other of breach. COMMISA initiated arbitration proceedings, prevailed, and in 2009 obtained an award of approximately $300 million.

COMMISA then petitioned the United States District Court for the Southern District of New York (Hellerstein, J.) ("Southern District") for confirmation of the award, which was done. PEP appealed the district court's judgment to this Court ("First Appeal") and simultaneously attacked the arbitral award in the Mexican courts. The Eleventh Collegiate Court in Mexico set aside the arbitral award on the ground that PEP, as an entity deemed part of the Mexican government, could not be forced to arbitrate. Armed with that decision, PEP moved in this Court to vacate the Southern District's judgment and remand the First Appeal in light of the Eleventh Collegiate Court's decision. We granted that motion. On remand, the Southern District conducted an evidentiary hearing, adhered to its previous ruling, issued a new judgment confirming the arbitral award, and thus set the stage for the present appeal.

We hold that the Southern District properly exercised its discretion in confirming the award because giving effect to the subsequent nullification of the award in Mexico would run counter to United States public policy and would (in the operative phrasing) be "repugnant to fundamental notions of what is decent and just" in this country. We further conclude that PEP's personal jurisdiction and venue objections are without merit. Finally, we hold that the Southern District did not exceed its authority by including in its judgment $106 million attributed to performance bonds that PEP collected. The judgment is affirmed.

## BACKGROUND

This protracted litigation, begun in 2004, has challenged the courts of two countries. We summarize here only those facts useful for understanding the issues presented and our resolution of them.

### 1.

COMMISA is a Mexican subsidiary of KBR, Inc., a United States construction and military-contracting corporation. PEP is one of four subsidiaries of Petroleos Mexicanos ("PEMEX"), an oil and gas company acting on behalf of the Mexican government. PEMEX and PEP are public entities of the Mexican government, but have the capacity to independently own property and carry out business under their own names. Together, PEMEX and its subsidiaries "comprise the state oil and

gas company of . . . Mexico." Joint Appendix ("J.A.") at 1515.

In 1997, COMMISA and PEP contracted for COMMISA to build oil platforms in the Gulf of Mexico. The contract, governed by Mexican law, contained the following arbitration clause:

> 23.3 **Arbitration**. Any controversy, claim, difference, or dispute that may arise from or that is related to, or associated with, the present Contract or any instance of breach with the present Contract, shall be definitively settled through arbitration conducted in Mexico City, D.F., in accordance with the Conciliation and Arbitration Regulations of the International Chamber of Commerce that are in effect at that time. The arbitrators shall be three in number, and the language in which the arbitration shall be conducted shall be Spanish.

J.A. at 93. PEP's (now disputed) authority to bind itself to arbitration was premised on the following provision of the "PEMEX and Affiliates Organic Law":

> In the event of international legal acts, Petróleos Mexicanos or its Affiliates may agree upon the application of foreign law, the jurisdiction of foreign courts in trade matters, and execute arbitration agreements whenever deemed appropriate in furtherance of their purpose.

Special Appendix ("SPA") at 41.

Two other provisions of the contracts bear on this appeal. One clause gave PEP the unilateral right to "Administrative Rescission" if COMMISA breached the contract or abandoned its work; another clause required COMMISA to post performance bonds.

**2.**

Difficulties arose, in part over PEP's insistence that the platforms be fully constructed before being put into place in the Gulf of Mexico, something COMMISA considered impractical given the weight of the completed platforms. Logistics and cost issues abounded, prompting the parties to execute a new contract in May 2003. The 2003 contract contained virtually-identical arbitration and administrative rescission clauses.

The 2003 contract failed to resolve the parties' differences, and the conflict reached climax in March 2004 when PEP, alleging that COMMISA had failed to meet contractual milestones and had abandoned the project, gave notice of its intent to administratively rescind the contract. PEP seized the platforms, which were 94 percent complete; ejected COMMISA from the work sites; and gave notice by letter of its intention to administratively rescind the contracts. After a fruitless conciliation effort, COMMISA filed a demand for arbitration with the International Chamber of Commerce in December 2004. When PEP informed COMMISA two weeks later that it was indeed effecting administrative rescission, COMMISA filed an *amparo* action in the District Court on Administrative Matters for the Federal District ("Mexican District Court") challenging the constitutionality, appropriateness, and timeliness of PEP's administrative rescission[1]; COMMISA lost on all counts.

During the pendency of the *amparo* action, arbitration proceedings began in Mexico City in May 2005, with the active participation of both parties.

In November 2006, the arbitration panel issued its Preliminary Award, finding that

---

1. An *amparo* action is a mechanism available to litigants in Mexico challenging the validity or constitutionality of governmental acts; the sole remedy is a declaration that the challenged governmental action is invalid.

it possessed jurisdiction over the dispute and enjoining PEP from attempting to collect on the performance bonds until the issuance of a final arbitral award authorizing collection. Prior to the issuance of the Preliminary Award, PEP's arguments did not include a contention that its administrative rescission was an act of authority not subject to arbitration under Mexican law.

### 3.

Two developments in Mexican law transpired while arbitration proceedings were ongoing. In December 2007, the Mexican Congress changed the available forum for claims that (like COMMISA's) raise issues related to public contracts, and vested exclusive jurisdiction for such disputes in the Tax and Administrative Court. Not incidentally, the switch curtailed the applicable statute of limitations: previously, ten years for suits in the Mexican District Courts; afterward, for suits in the Tax and Administrative Court, 45 days.

Second, in May 2009, the Mexican Congress enacted Section 98 of the Law of Public Works and Related Services ("Section 98"), which ended arbitration for certain claims (such as those by COMMISA):

An arbitration agreement may be executed regarding the disputes arising between the parties related to the construction of contractual clauses or related to issues arising from the performance of the contracts ... The administrative rescission, early termination of the contracts and such cases as the Regulation of this Law may determine may not be subject to arbitration proceedings.

J.A. at 3758.

### 4.

Promptly after the issuance of the Preliminary Award in November 2006—and before the enactment of Section 98—PEP asked the arbitration tribunal to reconsider its Preliminary Award and—for the first time—contended that administrative rescission was categorically exempt from arbitration as an act of authority on behalf of the Mexican government. The tribunal rejected this argument in its December 2009 Final Award, and, in a voluminous decision, found that PEP breached the contracts and awarded COMMISA approximately $300 million in damages.

COMMISA raced to confirm the award in the Southern District, which ruled in COMMISA's favor in August 2010. PEP appealed that judgment to this Court in the First Appeal and simultaneously challenged the arbitral award in Mexico by filing its own *amparo* action, which eventually made its way to the Eleventh Collegiate Court, the analog of the United States Court of Appeals for the District of Columbia Circuit. In September 2011, the Eleventh Collegiate Court held that PEP's rescission was not arbitrable and ordered that the award be annulled; its analysis repeatedly referenced the newly-enacted Section 98.

The First Appeal was still pending when the Eleventh Collegiate Court rendered its decision. Pressing its advantage, PEP successfully moved here for vacatur and remand so that the Southern District could consider the effect of the Eleventh Collegiate Court's decision. See Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción, No. 10–4656, 2012 WL 9346475, at *1 (2d Cir. Feb. 16, 2012).

On remand, the Southern District received further briefing and conducted a three-day evidentiary hearing chiefly focused on the meaning of applicable Mexican legal provisions. See Corporación Mex-

icana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción, 962 F.Supp.2d 642, 644 (S.D.N.Y. 2013). The parties presented dueling experts who disputed whether the Eleventh Collegiate Court's decision was consistent with the development of Mexican law, and whether the 2007 change in the applicable statute of limitations could apply retroactively to the instant dispute. Ultimately, the Southern District "decline[d] to defer to the Eleventh Collegiate Court's ruling," and again "confirm[ed] the Award" on the ground that annulment of the award "violated basic notions of justice in that it applied a law that was not in existence at the time the parties' contract was formed and left COMMISA without an apparent ability to litigate its claims." Id. Specifically, the Southern District concluded that the Eleventh Collegiate Court applied Section 98 retroactively "to favor a state enterprise over a private party," and that COMMISA would be left "without a remedy" for its claims given the compressed statute of limitations for actions instituted in the Tax and Administrative Court. Id. at 659–60.

PEP appeals from that judgment.

## DISCUSSION

 In reviewing a district court's confirmation of an arbitral award, we ordinarily review legal issues de novo and findings of fact for clear error. See Pike v. Freeman, 266 F.3d 78, 86 (2d Cir. 2001). In this case, because the Southern District's holding necessarily encompassed its decision to deny comity to a foreign judgment, the standard of review is modified: "[w]e review a district court's decision to extend or deny comity to a foreign proceeding for abuse of discretion." Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999). Accordingly, we review the Southern District's denial of comity for abuse of discretion, and we review underlying conclusions of law de novo and the underlying findings of fact for clear error. This approach is consistent with our precedent in other contexts. See Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 464 (2d Cir. 2013) ("We review a district court's grant of class certification for abuse of discretion, and review the conclusions of law underlying that decision de novo ... although 'we review for clear error the factual findings underlying th[at] ruling.'" (alteration in original) (citations omitted) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201 (2d Cir. 2008))).

As to the remaining issues on appeal, we review the Southern District's conclusions of law de novo and findings of fact for clear error. See, e.g., Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d Cir. 2005) (venue); Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 36 (2d Cir. 2001) (personal jurisdiction).

## I

PEP raises two threshold objections challenging: (1) the Southern District's exercise of personal jurisdiction over PEP, and (2) the location of venue in that district. We consider personal jurisdiction first.

 "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). "The actions of the defendant may amount to a legal submission to the jurisdiction of the court...." Id. at 704–05, 102 S.Ct. 2099. Therefore, "[t]he requirement that a court have personal jurisdiction is a due process right

that may be waived either explicitly or implicitly." Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d Cir. 1998); see also City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 133 (2d Cir. 2011) ("Personal jurisdiction, unlike subject-matter jurisdiction, can, however, be purposely waived or inadvertently forfeited."). The term "forfeiture" is more apt than "waiver" here because the issue is whether PEP has lost its personal jurisdiction objection through its conduct.[2]

When the First Appeal was pending, PEP fully briefed its jurisdiction and venue arguments. But, once armed with the Eleventh Collegiate Court decision, PEP moved this Court to vacate and remand to the Southern District for reconsideration. To state the obvious, PEP then believed that the Southern District would reverse course. Nowhere in that motion did PEP suggest that the relief it sought by motion here and on remand in the Southern District might offend "traditional notions of fair play and substantial justice" or otherwise implicate personal jurisdiction concerns. Gucci America, Inc. v. Weixing Li, 768 F.3d 122, 134 (2d Cir. 2014) (quoting Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement et al., 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Thus, PEP's due process objections evidently disappeared when its prospects of success were buoyed by the Eleventh Collegiate Court's decision. Because PEP affirmatively and successfully sought relief from this Court remanding for a new merits determination in the Southern District, it forfeited its argument that personal jurisdiction is lacking. PEP cannot now re-contest personal jurisdiction merely because it is dissatisfied with its tactical choice.[3]

Our sister circuits have reached similar conclusions in other contexts. See Gerber v. Riordan, 649 F.3d 514, 519 (6th Cir. 2011) (" '[T]he voluntary use of certain [district] court procedures' serve[s] as 'constructive consent to the personal jurisdiction of the [district] court....' " (alteration in original) (quoting Ins. Corp. of Ireland, 456 U.S. at 704, 102 S.Ct. 2099)); PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland), 260 F.3d 453, 460–61 (5th Cir. 2001) ("[W]hen 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.' " (quoting Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 443 (3d Cir. 1999))); see also Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co., 203 F.3d 835 (Table), 2000 WL 147392, at *3 (10th Cir. 2000) ("After its lengthy participation in this litigation, [and] efforts to seek affirmative relief ... [defendant] may not pull its personal juris-

---

2. See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) ("The term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right. Where a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term 'forfeiture' is more appropriate.").

3. COMMISA did not make the forfeiture argument in its initial brief. Rather, at our direction, the parties submitted post-argument letter briefs on the forfeiture issue. "Entertaining issues raised for the first time on appeal is discretionary with the panel hearing the appeal." Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994). The "general rule that an appellate court will not consider an issue raised for the first time on appeal" "is not an absolute bar ... the general rule is disregarded when we think it necessary to remedy an obvious injustice." Id. Here, as explained in text, our consideration of the issue is necessary to prevent PEP from reviving threshold arguments that are incompatible with seeking merits-based relief from this Court and the Southern District.

diction defense 'out of the hat like a rabbit.' " (quoting Fed. Deposit Ins. Corp. v. Oaklawn Apartments, 959 F.2d 170, 176 (10th Cir. 1992))).

Moreover, PEP's personal jurisdiction argument has changed over time, so that it is unclear whether the challenge that we find forfeited is one that was actually raised in the first instance. In the Southern District, PEP's initial motion to dismiss for lack of personal jurisdiction was premised on inadequate service of process. Due process concerns were nowhere to be found; indeed, PEP's counsel emphasized the limited scope of the personal jurisdiction argument, conceding that the well-known minimum contacts test was inapplicable to PEP.[4] It was not until briefing was complete that PEP raised before the Southern District the due process point it advances on appeal.[5]

■ Having sought additional proceedings addressed to the merits, both here and in the Southern District, PEP may not now contest personal jurisdiction. "To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A., 623 F.3d 440, 443 (7th Cir. 2010).

PEP contends that its motion for a remand to consider the Eleventh Collegiate Court's decision simply advanced a menu of options not limited to vacatur and remand, and that this Court's choice to remand cannot support a finding of forfeiture. This mischaracterizes PEP's litigation position before this Court on the First Appeal; PEP explicitly angled for a full vacatur and remand of the case, and it downplayed other alternatives. Rather than pursue the First Appeal on grounds (inter alia) of personal jurisdiction and venue, PEP effectively abandoned those arguments and pressed for a remand to consider intervening precedent on which PEP thought it could win.[6] That abandonment constitutes forfeiture.

* * *

■ In any event, PEP's due process argument fails because PEP is a corporation owned by a foreign sovereign. The jurisdictional protections of the Due Process Clause do not apply to "foreign states and their instrumentalities". Frontera Res.

---

4. See J.A. at 2006 ("Personal jurisdiction is effected by proper service, and our position is there is no proper service. The minimal contacts test has been eliminated by the Second Circuit in this context.").

5. Although COMMISA did not initially argue forfeiture, see supra n.3, it did argue that PEP waived its objection to personal jurisdiction by explicitly conceding that the jurisdictional protections of the Due Process Clause do not apply here. We need not consider COMMISA's waiver argument because we conclude, in any event, that these jurisdictional protections do not apply to PEP, see infra pp. 20-22, which affirmatively claims that it is functionally the Mexican government.

6. PEP, in its post-argument letter brief, argues that its request was tantamount to a request for a remand following an indicative ruling but concedes it chose not to follow this path. That choice had consequences; if PEP had moved for an indicative ruling, and the Southern District had issued such a decision, this Court could have "remand[ed] for further proceedings" but would *"retain[ ]"* jurisdiction unless [we] expressly dismisse[d] the appeal." Fed. R. App. P. 12.1(b) (emphasis added). That (or, for that matter, a remand pursuant to United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994)) is far afield from what PEP urged this Court to do,.which was a full vacatur and remand *without* qualification.

Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 399 (2d Cir. 2009). The same conclusion does not follow for foreign corporations; see Bensmiller v. E.I. Dupont de Nemours & Co., State of La., 47 F.3d 79, 81 (2d Cir. 1995) ("First, the court must determine if the state's long-arm statute reaches the foreign corporation. Second, if the statute does reach the corporation, then the court must decide whether that exercise of jurisdiction offends due process."). This distinction rests on the principle that due process rights can only be exercised by persons, see Frontera, 582 F.3d at 398, including corporations, which are persons at law. See Phillips v. Tobin, 548 F.2d 408, 411 (2d Cir. 1976). The line between a foreign sovereign and a foreign corporation can sometimes be indistinct, but our conclusion—that PEP falls in the former category—is informed by First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("Bancec").

▮▮▮ Bancec established the presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id. at 626–27, 103 S.Ct. 2591. The presumption, however, "may be overcome in certain circumstances," as "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created." Id. at 628–29, 103 S.Ct. 2591. Although Bancec disclaimed a "mechanical formula for determining the circumstances

under which the normally separate juridical status of a government instrumentality is to be disregarded," the Court indicated that a valid basis for "declin[ing] to adhere blindly to the corporate form" would be "where doing so would cause . . . an injustice." Id. at 632–33, 103 S.Ct. 2591. Thus Bancec relied on "equitable principles" to disregard the corporate form and thereby prevent the government of Cuba from hiding behind a juridical entity (to obtain relief) without itself appearing, which would necessarily waive sovereign immunity and force it to answer for a violation of international law. Id. at 630, 103 S.Ct. 2591. Although Bancec arose in a different context, it is "applicable when the question is whether the instrumentality should have due process rights to which the state is not entitled." Frontera, 582 F.3d at 400.

▮▮▮ This is one of the easy cases because PEP affirmatively claims that it is functionally the Mexican government—which it advances as the reason it cannot be forced to arbitrate. The Eleventh Collegiate Court opinion reinforces that view.[7] Applying "recognized equitable principles," PEP should be treated for personal jurisdiction purposes as the foreign sovereign it claims to be when it comes to other issues in this litigation. Bancec, 462 U.S. at 633, 103 S.Ct. 2591. In Mexico, oil is a state-owned resource, and PEP's actions sought to protect Mexican oil interests from a foreign private corporation; bluntly put, PEP acted as the state. That is the basis of the following argument by PEP that

---

7. See J.A. at 3749 ("[S]uch administrative rescission of the public works contract . . . involves the supervision of the resources of the State and society for the purposes of meeting the needs of the latter."); id. at 3750 ("[P]ublic powers that aim at safeguarding the public benefit and interest cannot" be waived); id. ("This is supported by the fact that the jurisdictional function exercised to set aside acts of authority is an exclusive function of the

State and can only be delegated to its bodies. However, acting in the capacity as state body entails pursuing, with its own will, public interests. This is evidently not done by private parties when they submit their disputes to arbitrators, for in those cases they are solely pursuing private objectives."); id. at 3754 ("[A]ppellant acted in its capacity as public entity and authority in a superior-to-subordinate relationship.").

nullification of the arbitral award should be upheld: "the view that *public* entities can abrogate contracts for reasons unavailable to private parties is hardly alien to American law. For example, *the U.S. Government* can block breach-of-contract suits against it by asserting that the litigation would reveal state secrets." Appellant's Br. at 53 (emphasis added). PEP's assertion (in arguing the merits) that it is integral to the Mexican government binds it for all portions of this appeal, including personal jurisdiction.

The authorities on which PEP relies fail to persuade. In GSS Group Ltd. v. National Port Authority, 680 F.3d 805, 814 (D.C. Cir. 2012), the D.C. Circuit recited the principle that the "presumption of separateness gives way only if a foreign 'corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,' or when 'broader equitable principle[s]' dictate that separate treatment 'would work fraud or injustice.'" (citations omitted) (quoting Bancec, 462 U.S. at 629, 103 S.Ct. 2591). The court applied the presumption of separateness: the National Port Authority of Liberia claimed to be an independent juridical entity, and the court observed that the opposing party "failed to contest that characterization." Id. at 817. The court therefore had no occasion to consider when a foreign corporation *should* be treated as its owner-sovereign. First Investment Corporation of Marshall Islands v. Fujian Mawei Shipbuilding, Limited, 703 F.3d 742, 755 (5th Cir. 2012) likewise notes that manipulation of the corporate form "to perpetrate a fraud or injustice" warrants overcoming the presumption of separateness. In any event, treating PEP as separate from the Mexican government for the purpose of personal jurisdiction would work an "injustice" insofar as it would allow PEP to

characterize its status vis a vís the Mexican government in whatever way is advantageous to its several arguments. See Bancec, 462 U.S. at 633, 103 S.Ct. 2591.

## II

This panel is unanimous in concluding that venue lies in the Southern District of New York. But we differ as to which rationale is strongest.

 The view of two of the panel members is that, for essentially the same reasons that PEP forfeited its challenge to personal jurisdiction, it has a fortiori forfeited its challenge to venue, because venue is "a limitation designed for the convenience of litigants, and, as such, may be waived by them." Olberding v. Ill. Cent. R.R. Co., 346 U.S. 338, 340, 74 S.Ct. 83, 98 L.Ed. 39 (1953). An objection to venue "may be lost ... by submission through conduct. Whether such surrender of a personal immunity be conceived negatively as a waiver or positively as a consent to be sued, is merely an expression of literary preference. The essence of the matter is that courts affix to conduct consequences as to place of suit consistent with the policy behind [venue statutes] which is 'to save defendants from inconveniences to which they might be subjected if they could be compelled to answer in any district, or wherever found.'" Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 168, 60 S.Ct. 153, 84 L.Ed. 167 (1939) (citation omitted) (quoting General Inv. Co. v. Lake Shore & M.S. Ry. Co., 260 U.S. 261, 275, 43 S.Ct. 106, 67 L.Ed. 244 (1922)). PEP cannot now reject this forum as extraordinarily inconvenient when it affirmatively sought relief from this Court and from the Southern District of New York.[8]

---

8. The concurring opinion argues that forfeiture is limited to "conduct that deliberately

## III

■ The domestic enforcement of foreign arbitral awards is governed by two international Conventions: the Inter-American Convention on International Commercial Arbitration ("Panama Convention") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). There is no substantive difference between the two [9]: both evince a "pro-enforcement bias." Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997). The Federal Arbitration Act ("FAA") expressly incorporates the terms of the Panama Convention. See 9 U.S.C. § 301 ("The Inter-American Convention on International Commercial Arbitration of January 30, 1975, shall be enforced in United States courts in accordance with this chapter.").[10]

Article V of the Panama Convention sets out—and limits—the discretion of courts in enforcing foreign arbitral awards: "The recognition and execution of the decision *may* be refused, at the request of the party against which it is made, only if such party is able to prove to the competent authority of the State in which recognition and execution are requested" one of seven defenses. Panama Convention art. V(1), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (emphasis added). "Article V provides the exclusive grounds for refusing confirmation under the Convention, [and] one of those exclusive grounds is where 't[he] award ... has been [annulled] or suspended by a competent authority of the country in which, or under the law of which, that award was made.'" Yusuf, 126 F.3d at 20 (quoting Panama Convention art. V(1)(e), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245); see also 9 U.S.C. § 207 ("The court shall confirm the award

---

avoids a final disposition of personal jurisdiction and venue issues until a loss on the merits appears likely," i.e. sandbagging. Concurring Op. At 2. PEP's conduct fits the bill: it sought full reconsideration of the merits in the Southern District after the venue and personal jurisdiction issues were fully briefed before this Court, then asserted its personal jurisdiction and venue defenses after losing on the merits in the Southern District.

The concurring opinion contends that PEP's motion to remand was not gamesmanship; however, in light of PEP's entire course of conduct, we see it distinctly otherwise. Further, the sole relief sought by PEP in its motion to remand was reconsideration of the result; PEP's motion argued against holding the appeal in abeyance as impractical given the changed circumstances of the litigation.

Finally, there is a basic and serviceable difference between a Jacobson remand (which elicits an answer to a question that may assist resolution of the *pending* appeal) and an ordinary remand (which allows reconsideration of the outcome). Our remand was of a second kind, notwithstanding that any further appeal was directed to the same panel. See, e.g., United States v. Rivalta, 925 F.2d 596, 597 (2d Cir. 1991).

9. See Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc., 23 F.3d 41, 45 (2d Cir. 1994) ("The legislative history of the Inter-American Convention's implementing statute, however, clearly demonstrates that Congress intended the Inter-American Convention to reach the same results as those reached under the New York Convention: 'The New York Convention and the Inter-American Convention are intended to achieve the same results ... in view of ... the parallel legislation under the Federal Arbitration Act that would be applied to the Conventions, [it is expected] that courts in the United States would achieve a general uniformity of results under the two conventions.'"(quoting H.R. Rep. No. 501, 101st Cong., 2d Sess. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 675, 678)).

10. The Panama Convention applies to this case since a "majority of the parties to the arbitration agreement are citizens of ... States that have ratified or acceded to the [Panama Convention] and are member States of the Organization of American States." 9 U.S.C. § 305(1).

unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."). In sum, a district court *must* enforce an arbitral award rendered abroad unless a litigant satisfies one of the seven enumerated defenses; if one of the defenses is established, the district court *may* choose to refuse recognition of the award.

■■ At first look, the plain text of the Panama Convention seems to contemplate the unfettered discretion of a district court to enforce an arbitral award annulled in the awarding jurisdiction. However, discretion is constrained by the prudential concern of international comity, which remains vital notwithstanding that it is not expressly codified in the Panama Convention. See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 854 (2d Cir. 1997) ("Although courts in this country have long recognized the principles of international comity and have advocated them in order to promote cooperation and reciprocity with foreign lands, comity remains a rule of 'practice, convenience, and expediency,' rather than of law." (quoting Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971))); In re Maxwell Comm'n Corp. plc, 93 F.3d 1036, 1047 (2d Cir. 1996) ("When construing a statute, the doctrine of international comity is best understood as a guide where the issues to be resolved are entangled in international relations.").

■■ Accordingly, "a final judgment obtained through sound procedures in a foreign country is generally conclusive ... *unless* ... enforcement of the judgment would offend the public policy of the state in which enforcement is sought." Ackermann v. Levine, 788 F.2d 830, 837 (2d Cir. 1986) (emphasis in original). "A judgment is unenforceable as against public policy to the extent that it is 'repugnant to funda-

mental notions of what is decent and just in the State where enforcement is sought.'" Id. at 841 (quoting Tahan v. Hodgson, 662 F.2d 862, 864 (D.C. Cir. 1981)); see also Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 809 F.3d 737, 743 (2d Cir. 2016) ("Nevertheless, 'courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States.'" (quoting Pravin, 109 F.3d at 854)).

The public policy exception does not swallow the rule: "[t]he standard is high, and infrequently met"; "a judgment that 'tends clearly' to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property is against public policy." Ackermann, 788 F.2d at 841 (quoting Somportex, 453 F.2d at 443). The exception accommodates uneasily two competing (and equally important) principles: [i] "the goals of comity and res judicata that underlie the doctrine of recognition and enforcement of foreign judgments" and [ii] "fairness to litigants." Id. at 842.

Precedent is sparse; but the few cases that are factually analogous have endorsed this approach. See Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd., 191 F.3d 194, 197 n.3 (2d Cir. 1999) ("Recognition of the Nigerian [annulment of the arbitral award] in this case does not conflict with United States public policy."); see also TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 938 (D.C. Cir. 2007) ("*Baker Marine* is consistent with the view that when a competent foreign court has nullified a foreign arbitration award, United States courts should not go behind that decision absent extraordinary circumstances not present in this case.... Therefore, it is unsurprising that the courts have carefully limited the occasions when a foreign judg-

ment is ignored on grounds of public policy. A judgment is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" (citation omitted) (quoting Ackermann, 788 F.2d at 841)).

Consequently, although the Panama Convention affords discretion in enforcing a foreign arbitral award that has been annulled in the awarding jurisdiction, and thereby advances the Convention's pro-enforcement aim, the exercise of that discretion here is appropriate only to vindicate "fundamental notions of what is decent and just" in the United States. Id. (quoting Ackermann, 788 F.2d at 841).

**IV**

■ Applying this standard, we conclude that the Southern District did not abuse its discretion in confirming the arbitral award notwithstanding invalidation of the award in the Mexican courts. The high hurdle of the public policy exception is surmounted here by four powerful considerations: (1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation.

**1. Contractual Waivers of Sovereign Immunity**

■ The "Pemex and Affiliates Organic Law" specifically authorized PEP to agree to execute arbitration agreements, as it did in both the 1997 and 2003 contracts; the arbitration clauses likewise

constrained COMMISA to arbitrate as the sole recourse for challenging any breach. When arbitration proceedings were underway, PEP participated without contending that its act of administrative rescission was beyond the reach of arbitration; that argument was advanced only after PEP's loss was presaged by issuance of the Preliminary Award.

■ That valid waivers must be enforced is settled domestic law. The Supreme Court has blessed contractual waivers of sovereign immunity and accompanying agreements to arbitrate. See C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418–23, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001) ("We are satisfied that the Tribe in this case has waived, with the requisite clarity, immunity from the suit.... brought to enforce [the] arbitration award ... [t]he Tribe clearly consented to arbitration and to the enforcement of arbitral awards ... the Tribe thereby waived its sovereign immunity from ... suit."); Cooke v. United States, 91 U.S. 389, 398, 23 L.Ed. 237 (1875) ("If [the United States] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there.").[11]

These values are not local. The North American Free Trade Agreement ("NAFTA"), ratified by Mexico and the United States, treats arbitration as a "mechanism for the settlement of investment disputes that assures both equal treatment among investors of the Parties in accordance with the principle of international reciprocity and due process before an impartial tribunal." NAFTA art. 1115, Jan. 1, 1994.

11. The Restatement of Foreign Relations Law also espouses this view. See Restatement (Third) of the Foreign Relations Law of the United States § 456(2) (1987)("Under the law of the United States ... an agreement to arbitrate is a waiver of immunity from jurisdiction in ... an action to enforce an arbitral award rendered pursuant to the agreement.").

Giving effect to PEP's twelfth-hour invocation of sovereign immunity shatters COMMISA's investment-backed expectation in contracting, thereby impairing one of the core aims of contract law. See Hunt Constr. Grp., Inc. v. Brennan Beer Gorman/Architects, P.C., 607 F.3d 10, 14 (2d Cir. 2010) ("[C]ontract law . . . is designed to enforce parties' contractual expectations . . . .").

## 2. Retroactive Application of Laws

Giving effect to the nullification would likewise impair the closely-related concept of avoiding retroactive application of laws. The Mexican government's adoption of Section 98 was an abrupt departure from the "Pemex and Affiliates Organic Law" as well as from the contracts signed by the parties; allowing Section 98 to nullify COMMISA's arbitral award would deprive COMMISA of its contract rights through a retroactive change in law.

 Retroactive legislation that cancels existing contract rights is repugnant to United States law. That repugnance is "deeply rooted in [Supreme Court] jurisprudence, and embodies a legal doctrine centuries older than our Republic." Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." Id. Anti-retroactivity is a principle embedded in "several provisions" of the Constitution, including:

- The Ex Post Facto Clause's ban on retroactive application of penal legislation;
- The proscription against states retroactively impairing the obligation of contracts;

- The prohibition on Bills of Attainder, stopping legislatures from "singling out disfavored persons and meting out summary punishment for past conduct"; and
- The Due Process Clause, and corresponding rights to "fair notice".

Id. at 266, 114 S.Ct. 1483. It is therefore understatement to observe that "[r]etroactivity is not favored in the law." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). As the Southern District recognized, "retroactive application of laws and the unfairness associated with such application is at the center of the dispute before me." Corporación Mexicana, 962 F.Supp.2d at 659.

Prior to the enactment of Section 98, PEP was authorized to arbitrate, did in fact agree to do so, and actively participated in the arbitration proceedings. The effect of the ruling by the Eleventh Collegiate Court—that acts of administrative rescission are not arbitrable—may well have been compelled by the legislature's enactment of Section 98. But the effect of the ruling amounts to retroactive application of that law. True, the Eleventh Collegiate Court specifically stated it was not retroactively applying Section 98, and we are in no position to pass upon that court's interpretation of Mexican law, or upon the sufficiency of its precedent. We are concerned here with the effect of Section 98 in these circumstances and upon these parties. And it is incontestable that the capacity of PEP to arbitrate was established in prior law; that it was withdrawn with respect to certain disputes that had already arisen; and that it was withdrawn in a way that frustrated contractual expectation, undid an arbitral award, and precluded redress by COMMISA in any forum. The sequence of events and the circumstances in which Section 98 was enacted thus resulted in a retroactive

application of Section 98 as a matter of *United States* law. That PEP is part of the government that promulgated the law does not help at all.

PEP argues that the Eleventh Collegiate Court's decision followed from a 1994 Mexican Supreme Court decision, and that COMMISA was thus on notice prior to 2009 that administrative rescissions were not arbitrable. Whether the Eleventh Collegiate Court properly reasoned from the 1994 precedent is emphatically not for U.S. courts to say. But notice is germane to the issue of enforcement. It therefore matters that the word "arbitration" does not appear in the 1994 decision, which simply declares that administrative rescission is an act of authority. One of PEP's own witnesses, in the evidentiary hearing ·before the Southern District, testified that the 1994 decision was a "weak premise" for the Eleventh Collegiate Court to rely upon, considering the number of other cases going the other way. J.A. at 3072-73. It is therefore unsurprising that the opinion of the Eleventh Collegiate Court relies heavily on Section 98 and very little on the Mexican Supreme Court decision.[12]

### 3. Availability of a Forum

If the Southern District had recognized and implemented the nullification of the arbitral award, COMMISA would have had no sure forum in which to bring its contract claims. The imperative of having cases heard—somewhere—is firmly embedded in legal doctrine:

- The grant of a <u>forum non conveniens</u> motion that would otherwise be proper "would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 254 n.22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

- The general rule of mootness is relaxed for issues that are "capable of repetition, yet evading review" because otherwise parties would be left "without a chance of redress." <u>S. Pac. Terminal Co. v. Interstate Commerce Comm'n</u>, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

- In federal habeas corpus cases, a state prisoner can overcome a procedural default stemming from state restrictions on direct appeal, given a showing of cause and prejudice to allow the prisoner "fair process" and "the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims." <u>Martinez v. Ryan</u>, — U.S. —, 132 S.Ct. 1309, 1317, 182 L.Ed.2d 272 (2012).

These examples spring from the same source: litigants with legal claims should have an opportunity to bring those claims somewhere.

---

12. <u>See</u> J.A. at 3758-63 ("This criterion is strengthened by the fact that, due to the amendments of the current law of Public Works and Related Services, Section 98 states as follows.... The express prohibition that the administrative rescission or the early termination of this type of contract cannot be subject to arbitration is present in the second paragraph of this legal provision ... it is evident that the current trend of the legislator regarding public works is to protect the economy and public expenditure by abandoning the practices that were aimed at granting more participation to private parties than to the State. Therefore, the State should be granted, once again, suitable mechanisms to fulfill those objectives ... if, as in this case, a contract is subject to administrative rescission by a party acting in the capacity as authority such act may not be tried, modified, avoided or altered by an arbitration panel. This would be contrary to public policy which is currently particularly protected by the amendment of the law which expressly sets forth such prohibition.").

Absent confirmation of the award, COMMISA would lose the opportunity to bring its claims because of the change in Mexican law subjecting COMMISA's claims to the 45-day statute of limitations in the Tax and Administrative Court. It is no conjecture that COMMISA's suit would be dismissed as time-barred; the Tax and Administrative Court did precisely that. See J.A. at 2870-71.

The statute of limitations is not the only barrier COMMISA would face. Its claims were tossed by the Tax and Administrative Court on the additional ground that, because COMMISA's claims were presented in the Mexican District Court, they were barred by res judicata. See J.A. at 2872. This also raises equitable concerns. After PEP rescinded, COMMISA instituted an *amparo* action in the Mexican District Court, which the arbitral panel presumably could not adjudicate.[13] COMMISA lost. Later, after the promulgation of Section 98, when COMMISA sought a ruling in the Tax and Administrative Court, that court rejected COMMISA's *breach* claims on the ground of res judicata, citing the *amparo* action. Since the arbitral award favorable to COMMISA was treated as a legal nullity, COMMISA was thus twice the victim of unforseen changes in the law. Such a result offends basic domestic principles of claim preclusion. See Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action.") (emphasis added).

We agree with the Southern District that COMMISA's inability to have its breach claims heard magnifies the injustice. See Corporación Mexicana, 962 F.Supp.2d at 659 ("[T]his unfairness was exacerbated by the fact that the Eleventh Collegiate Court's decision left COMMISA without a remedy to litigate the merits of the dispute that the arbitrators had resolved in COMMISA's favor.").

### 4. Government Expropriation Without Compensation

PEP, acting on behalf of the Mexican government, rescinded the contracts and forcibly removed COMMISA from the project sites. Then, by legislation, Mexico frustrated relief that had been granted to COMMISA in the arbitral forum and consigned it to a forum in which relief was foreclosed both by the statute of limitations and res judicata. The Eleventh Collegiate Court did no more than apply this Mexican law. At the same time, the enforcement of such Mexican law amounted to a taking of private property without compensation for the benefit of the government. In the United States, this would be an unconstitutional taking. See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." (citation omitted)). This feature of United States law is not peculiar to this country. NAFTA provides that "[n]o party may ... take a measure tantamount to nationalization or expropriation of such an investment ('expropriation'), except ... on payment of compensation in accordance with paragraphs 2 through 6." NAFTA

---

**13.** See J.A. at 1486 ("COMMISA sought to stop PEP from administratively rescinding the Contracts pursuant to public law provisions, the subject matter of which cannot be brought before this Arbitral Tribunal's Jurisdiction.").

art. 1110, Jan. 1, 1994. No payment was made in accordance with NAFTA or otherwise.

\* \* \*

Any court should act with trepidation and reluctance in enforcing an arbitral award that has been declared à nullity by the courts having jurisdiction over the forum in which the award was rendered. However, we do not think that the Southern District second-guessed the Eleventh Collegiate Court, which appears only to have been implementing the law of Mexico. Rather, the Southern District exercised discretion, as allowed by treaty, to assess whether the nullification of the award offends basic standards of justice in the United States. We hold that in the rare circumstances of this case, the Southern District did not abuse its discretion by confirming the arbitral award at issue because to do otherwise would undermine public confidence in laws and diminish rights of personal liberty and property. See Ackermann, 788 F.2d at 841. Taken together, these circumstances validate the exercise of discretion and justify affirmance.

## V

Pursuant to the contracts, COMMISA posted $106 million in performance bonds. After entry of the Final Award in favor of COMMISA, PEP collected on the bonds. The Southern District's judgment includes the $106 million. PEP argues that inclusion of that amount in the judgment exceeded the bounds of the Southern District's confirmation authority. See 28 U.S.C. 1605(a)(6).

 "[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."

Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984). The pertinent question, then, is whether the performance bonds were part of the "final arbitration award." Id.

 The Preliminary Award ordered PEP to "refrain from filing any claim attempting to collect the bonds granted in its favor ... until the Tribunal issues its final award, *and* according to such award, PEP has any right to claim the payment of the bonds." J.A. at 143 (emphasis added). The Final Award concluded that PEP was "defeated in the merits" of the dispute, that PEP engaged in "repeated breaches," and that COMMISA's success entitled it to damages, litigation expenses, and costs. Id. at 861-68. The Final Award also emphasized the validity of the Preliminary Award, and its injunction against collecting on the performance bonds: "[I]t must be reminded that in the Preliminary Award it was determined that the Tribunal has jurisdiction to hear ... the application of conventional penalties through the collection on performance bonds posted by claimant.... The aforementioned Preliminary Award is binding and unalterable, as it is now final." Id. at 180.

The conditions stated in the Preliminary Award for collection on the performance bonds were the issuance of a final award (which happened), "*and* according to such award, PEP has any right to claim the payment of the bonds"—a condition that was conspicuously unsatisfied. Id. at 143 (emphasis added). The order enjoining PEP from collecting on the performance bonds was therefore part of the Final Award itself.

PEP argues that the omission of any reference to the performance bonds in the damages section of the Final Award points the other way because the panel enumerated the items that comprised the Award in painstaking—and presumably comprehen-

sive—detail. This argument, however, ignores the sequence of events; PEP relied on the Eleventh Collegiate Court decision as a judgment authorizing it to collect on the performance bonds. But that ruling was issued in October 2011—*after* the Final Award had already issued. So there was no occasion for the Final Award to specify damages stemming from conduct that had not yet occurred, especially since PEP was forbidden from collecting on the bonds unless and until the tribunal determined that PEP was entitled to do so.

Although the confirmation role is limited, we have still allowed district courts to interpret the contents of applicable awards. See Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir. 1993) ("In finding that the award encompassed rights to the underlying works, the district court properly interpreted the award."). The Southern District's interpretation was sound; the $106 million was properly included in the judgment.

## CONCLUSION

For the foregoing reasons, the judgment of the Southern District is affirmed.

WINTER, Circuit Judge, concurring:

I concur in my colleagues' disposition of this appeal while disagreeing with their imposing of a forfeiture with regard to personal jurisdiction and venue. I agree that PEP should be treated as a foreign sovereign for personal jurisdiction purposes, see Maj. Op. 102–04, and that personal jurisdiction over PEP exists in the Southern District of New York. I also conclude that venue is proper in the Southern District of New York under 28 U.S.C § 1391(f)(3) because PEP is an "agency or instrumentality" of the State of Mexico and was "doing business" in New York.

### a) Forfeiture

My colleagues rule, sua sponte, that, "[b]ecause PEP affirmatively and successfully sought relief from this Court remanding for a new merits determination in the Southern District, it forfeited its argument that personal jurisdiction is lacking." Maj. Op. 101. "[F]or essentially the same reasons[,] ... it has a fortiori forfeited its challenge to venue." Maj. Op. 104.

My colleagues rely principally on "gamesmanship" or "sandbagging" cases, Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 62 (2d Cir. 1999) (finding defendant forfeited personal jurisdiction defense by not moving to dismiss in order to "gamble it could raise the personal jurisdiction issue on the eve of trial, in case a trial occurred"), none of which lend their ruling any support whatsoever. The gamesmanship arises from the fact that defendants have an interest in obtaining a favorable ruling on the merits that would constitute res judicata. Pursuit of this interest creates an incentive on their part to preserve any existing personal jurisdiction and venue defenses but not seek a definitive ruling—which might lead only to a new lawsuit elsewhere—until a favorable merits ruling appears unattainable. Courts have the opposite incentive. Why address the merits at all if plaintiffs are in the wrong court? Therefore, we have found forfeiture in conduct that deliberately avoids a final disposition of personal jurisdiction and venue issues until a loss on the merits appears likely.

No such gamesmanship occurred in this matter. Although the grounds on which PEP challenged personal jurisdiction in the district court changed over the course of the litigation, PEP timely litigated that issue and the issue of proper venue in the district court. In moving to dismiss the petition to confirm the ICC's arbitration award, PEP filed a motion to dismiss, ar-

guing that (i) the district court lacked personal jurisdiction, and (ii) venue was improper under 28 U.S.C § 1391(f)(3) because PEP was not doing business in New York. An August 25, 2010 hearing thoroughly explored those issues. In confirming the ICC's arbitration award, the district court expressly held that it had personal jurisdiction over PEP and that venue was proper in the Southern District of New York.

On appeal, PEP's brief extensively argued that "[t]he district Court [ ] erred in holding that it had personal jurisdiction over PEP," Br. of Resp't-Appellant at 19, Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción ("PEMEX"), No. 10–4656–cv, 2012 WL 9346475 (2d Cir. Feb. 16, 2012), and that it "erred in holding that venue was proper in the SDNY," id. at 22.

After briefing in this court, however, the Eleventh Collegiate Court of Mexico rendered its decision invalidating the ICC's arbitration award. PEP understandably moved before this panel for a remand to allow the district court to reconsider the validity of the arbitration award in light of the Mexican ruling. In so moving, PEP did not mention the personal jurisdiction and venue issues, already fully briefed before this panel, because there had been no intervening events casting light upon those issues. However, PEP requested in the alternative that the appeal be held in abeyance pending disposition of a Fed. R. Civ. P. 60(b) motion, based on the Mexican court ruling, in the district court. Appearing as amicus curiae, the United States supported the motion to remand.

The seeking of a remand was perfectly understandable. The intervening Mexican decision was of unquestioned relevance to this appeal, as the appearance of the United States as amicus curiae and Judge Ja-

cobs' opinion amply demonstrate. In all probability, had oral argument proceeded, we would have remanded to obtain the views of the district court as to the bearing of the Mexican judicial ruling on the merits issues.

In light of the indisputable relevance of the Mexican ruling, my colleagues' forfeiture ruling is not only sua sponte, but also unprecedented. We have ruled that courts should proceed with "caution" in finding forfeiture of personal jurisdiction defenses. Atlas, 197 F.3d at 60. Forfeiture is to be principally found in cases of "sandbagging," for example, where a defendant "rais[es] the issue of personal jurisdiction on a motion to dismiss, [then] deliberately refrain[s] from pursuing it any further when his motion is denied in the hopes of receiving a favorable disposition on the merits, and then rais[es] the issue again on appeal only if he [is] unhappy with the district court's ultimate decision." Peterson v. Highland Music, Inc., 140 F.3d 1313, 1318 (9th Cir. 1998). "Typically, courts have found forfeiture only if the party waited years before moving or engaged in substantial pre-trial activity." Infinity Consulting Grp., LLC v. Am. Cybersystems, Inc., 2010 WL 2267470, *1–2 (E.D.N.Y. May 30, 2010); see also In re Helicopter Crash Near Wendle Creek, Brit. Columbia on Aug. 8, 2002, 485 F.Supp.2d 47, 52 (D. Conn. 2007) (noting that "[i]n most cases where courts have found waiver, the defendant has waited multiple years after its answer to file a motion to dismiss").

More specifically, in most cases where we and other courts have found forfeiture, defendants failed to bring up personal jurisdiction or improper venue defenses in their answer, as required by Fed. R. Evid. 12(h), or had moved for summary judgment on the merits prior to moving to dismiss for lack of personal jurisdiction or

improper venue.[1] In other cases, courts have found forfeiture where the defendant defaulted and later brought a personal jurisdiction defense,[2] or where the defendant began vigorously arguing personal jurisdiction or improper venue defenses only after participating in the litigation for a very long time.[3] In no cases have courts found forfeiture in the circumstances present here—where PEP timely and repeatedly sought dismissal of the action based on personal jurisdiction and improper venue defenses, failing to do so only in moving to remand—or holding the appeal in abeyance—for the district court's consideration of the Mexican court decision rendered after briefing of the appeal in this court.

In fact, many courts have declined to find forfeiture where defendants did not argue personal jurisdiction or improper venue defenses at every possible stage of litigation, including cases in which litigants were quite derelict in raising these defenses. See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc., 2016 WL 160721, at *4 (E.D.N.Y. Jan. 13, 2016) (refusing to find forfeiture of personal jurisdiction defense where defendant first made the defense in a motion to dismiss but later failed to make the defense when the district court was considering to dismiss the case on other grounds); In re Helicopter Crash Near Wendle Creek, Brit. Columbia, 485 F.Supp.2d at 51–52 (finding no forfeiture of personal jurisdiction defense where defendant pled the defense in its answer but waited four months to file a motion to dismiss); Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc., No. 00–cv–0201, 2001 WL 1041990, *3–4 (S.D.N.Y. Sept. 7, 2001) (finding no forfeiture of personal jurisdiction defense—even though defendant did not assert the defense until thirteen months after the complaint was filed and the parties had completed discovery on substantive claims—because "[d]efendant's delay in bringing its motion does not rise to the

---

1. See Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 (2d Cir. 1966) (ruling that the defendants had forfeited the privilege to object to improper venue when they did not make their objection until after the district court raised the issue sua sponte—long after the defendants had originally filed their answer, which did not oppose venue); Thompson v. United States, 312 F.2d 516, 520 (10th Cir. 1962) (holding that defendant had waived any defense of improper venue when he made the argument only after filing a motion for summary judgment); Misch on Behalf of Estate of Misch v. Zee Enterprises, Inc., 879 F.2d 628, 631–32 (9th Cir. 1989) (noting that a defendant waives personal jurisdiction and improper venue defenses when he files for summary judgment prior to filing motions to dismiss for lack of personal jurisdiction or improper venue).

2. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 115 (2d Cir. 2011) (finding defendants waived their personal jurisdiction defense when they initially "press[ed]" that defense but then willfully withdr[ew] from the litigation and default[ed], even after being warned of the consequences of doing so"); Trustees of Cent. Laborers' Welfare Fund v. Lowery, 924 F.2d 731, 732–33 (7th Cir. 1991) (finding forfeiture after defendants moved to vacated default judgment entered against them six years earlier); Robertson v. Dowbenko, 443 Fed.Appx. 659, 661–62 (2d Cir. 2011) (finding defendant forfeited personal jurisdiction defense by not complying with discovery orders resulting in default).

3. See Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61 (2d Cir. 1999) (finding defendant forfeited personal jurisdiction defense by not moving to dismiss for four years after filing his answer and after "considerable pretrial activity [had] occurred"); Continental Bank, N.A. v. Meyer, 10 F.3d 1293, 1297 (7th Cir. 1993) (finding personal jurisdiction defense forfeited where defendants had "fully participated in litigation of the merits for over two-and-a-half years[, including participating in discovery,] without actively contesting personal jurisdiction").

level of egregiousness that other courts have found sufficient to constitute a forfeiture"); Infinity Consulting Grp., LLC, 2010 WL 2267470, at *1–2 (finding no forfeiture of personal jurisdiction defense even when defendants waited nearly ten months before moving to dismiss on personal jurisdiction grounds and eight months to answer the complaint); Johnson v. Masselli, 2008 WL 111057, at *3 (N.D.Ind. Jan. 4, 2008) (ruling defendants did not waive objection to venue by defending against temporary restraining order and participating in hearings and discovery related to preliminary injunction request where objection to venue was raised in responsive pleading); Biro v. Condé Nast, 2014 WL 4851901, at *7 (S.D.N.Y. Sept. 30, 2014) (no forfeiture where defendant filed a motion to dismiss "eleven months after filing her answer," and, "[i]n the interim, the parties were engaging in jurisdictional discovery, a process that generated disputes as late as" one month before the motion was filed). I have found no case imposing forfeiture in circumstances like those before us—the sole act of delay in pursuing personal jurisdiction and venue defenses being an alternative (to holding the appeal in abeyance) request for a remand on indisputably valid grounds—much less doing so sua sponte.

My colleagues muddy the waters by seeking to distinguish this case from our well-established and routine practice of so-called Jacobson remands. In typical Jacobson remands, we remand partial jurisdiction to the district court to supplement the record on a discrete factual or legal issue while retaining jurisdiction over the original appeal. United States v. Jacobson, 15 F.3d 19, 22 (2d Cir. 1994). Jacobson remands are enormously helpful tools, see United States v. Salameh, 84 F.3d 47, 50 (2d Cir. 1996) (noting that Jacobson remands "eliminate[ ] any question as to the district court's jurisdiction [over the par-

ticular issue] and enables [the appellate] [c]ourt to provide, if appropriate, for the automatic restoration of appellate jurisdiction, without the need for a new notice of appeal"). This rationale may be the result of my colleagues' fear that future litigants will avoid or argue against Jacobson remands entirely, lest they risk forfeiting claims or defenses raised in their original briefs.

My colleagues distinguish this matter from routine Jacobson remands on the ground that we retained no jurisdiction in our remand in this matter. Relying on the cession of partial or full jurisdiction for such a distinction is irrelevant, in my view. A request for a Jacobson remand may well be part of a factual pattern justifying a forfeiture ruling.

In this matter, our remand order limited the issues to be decided by the district court and directed that any subsequent appeal be referred to this panel. The remand order confined the district court to addressing the effect of the intervening decision of the Eleventh Collegiate Court of Mexico on the arbitrability issues. PE-MEX, 2012 WL 9346475, at *1. In remanding, we specifically stated we were "reach[ing] no other issue," and we ordered that "[a]ny subsequent appeal in th[e] case should be referred to this panel." Id.

In my innocence—or lack of prescience—I thought we were ordering the reference of any subsequent appeal to this panel in the interests of judicial economy because we had familiarized ourselves with the issues other than arbitrability, i.e. personal jurisdiction and venue. As a panel member voting in favor of the remand as justified in the interests of judicial economy, it never occurred to me that my colleagues viewed the limited remand as limiting the issues to be heard on the

subsequent appeal. Had I realized such a limitation was contemplated, I would have dissented. It is of small comfort that my innocence and lack of prescience was shared by COMMISA, which never raised forfeiture in arguing the personal jurisdiction and venue issues on the second appeal. Rather, my colleagues dispose of PEP's proffer of an alternative to a full vacatur and remand, i.e. retaining jurisdiction but holding the appeal in abeyance pending disposition of a Rule 60(b) motion, is disregarded because it was "downplayed" while PEP "angled" for a full remand, subjective purposes not glaringly obvious to this observer.

### b) Venue

Because I agree with my colleagues on the merits of the personal jurisdiction issue, I turn to the venue question.

Under FSIA, "[a] civil action against a[n] [agency or instrumentality of a foreign state] . . . may be brought[ ] in any judicial district in which the agency or instrumentality is licensed to do business or is doing business . . . ." See 28 U.S.C. § 1391(f)(3).[4]

FSIA defines "agency or instrumentality of a foreign state" as "any entity" that is (1) "a separate legal person, corporate or otherwise," (2) "an organ of [the] foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) "neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." 28 U.S.C. § 1603(b).

That the first and third requirements are met by PEP is not in dispute.

Regarding the second requirement, because PEP is owned by PEMEX, PEP is not an entity whose majority ownership is held by a foreign state. See Dole Food Co. v. Patrickson, 538 U.S. 468, 475–77, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (entity whose ownership is separated by "one or more corporate tiers" from foreign state does not fall within majority ownership provision of 28 U.S.C. § 1603(b)(2)). So, the question becomes whether PEP is an "organ" of the State of Mexico. I believe that it is.

In Filler v. Hanvit Bank, we adopted a five factor test to determine whether a corporation is an "organ" of a foreign state:

(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

378 F.3d 213, 217 (2d Cir. 2004) (quoting Kelly v. Syria Shell Petroleum Dev. B.V., 213 F.3d 841, 846–47 (5th Cir. 2000)); see also USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 209 (3d Cir. 2003). "Filler invites . . . a balancing process, without particular emphasis on any given factor and without requiring that every factor weigh in favor of, or against, the entity claiming FSIA immunity." In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 85 (2d Cir.

---

**4.** Title 28 U.S.C. § 1391(f)(3) states that "[a] civil action against a foreign state as defined in section 1603(a) of this title may be brought—in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title." Title 28 U.S.C. § 1603(a), in turn, defines a "foreign state" to "include . . . an agency or instrumentality of a foreign state as defined in [28 U.S.C. § 1603(b)]."

2008) (internal citation and quotation marks omitted), abrogated on other grounds by Samantar v. Yousuf, 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010); see also European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129 (2d Cir. 2014), rev'd on other grounds by —— U.S. ——, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016).

PEP easily satisfies factors (1), (2), (4), and (5), and may satisfy (3)—hiring public employees—although the record is unclear in this regard. First, PEP was created for a national purpose. Since 1938, it has been "entrusted [ ] with the central planning and management of Mexico's petroleum industry." J. App'x at 1526. Second, PEP is highly supervised by the State of Mexico. The Mexican government controls the annual budget of PEMEX—which controls PEP—and can "intervene directly ... in [PEMEX and its subsidiaries] commercial and operational affairs." Id. at 1523. Under PEMEX's charter, the Mexican government appoints all members of PEMEX's board of directors, with ten of the fifteen directors being representatives of the state and/or public officials. See RJR Nabisco, 764 F.3d at 145 ("We have said that a foreign state actively supervises an organ when it appoints the organ's key officials and regulates some of the activities the organ can undertake.") Third, "Mexican law gives [PEP] the exclusive right to exploit Mexico's hydrocarbon reserves." Petróleos Mexicanos, Annual Report (Form 20-F) 23 (June 30, 2009). Fourth, Mexican law treats PEP as a government entity, as starkly evidenced by the Eleventh Collegiate Court of Mexico's decision that PEP could not be forced to arbitrate precisely because it is a part of the Mexican government. See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140, 143 (2d Cir. 2007) (finding the foreign state law factor of Filler satisfied when the "Korean government informed the State Department and the district court that it treats [the entity] as a government entity").

Under our caselaw, if PEP was so intertwined with the State of Mexico as to be deemed the state itself, Section 1391(f)(3) would be inapplicable. See 28 U.S.C.A. § 1391(f)(3) (applying only "if the action is brought against an agency or instrumentality of a foreign state"). In Garb v. Republic of Poland, we explained that, if the "core functions" of the legal entity "are predominantly governmental," it is a "foreign state," while if the "core functions" of the legal entity are "predominantly ... commercial," it is an "agency or instrumentality of a foreign state." 440 F.3d 579, 594 (2d Cir. 2006). In Garb, we held that the Ministry of the Treasury of Poland is not an "agency or instrumentality" of the Polish state, because the core functions of the Treasury are governmental. Its roles included "hold[ing] and administer[ing] the property of the Polish state," and it also "represent[ed] the Polish State with respect to financial claims brought against the State." Id. at 594–95.

In contrast, PEP is clearly a commercial entity. It has no regulatory functions. Cf. Servaas Inc. v. Rep. of Iraq, 2011 WL 454501, at *3 (2d Cir. Feb. 10, 2011) (finding the core function of the Ministry of Industry of Iraq is governmental and not commercial because, in part, it approves "applications for trademark registration, a regulatory function that [is] quintessentially governmental"). Its primary role is to find, develop, and sell oil and natural gas. This is an inherently commercial role. See NML Capital, Ltd. v. Rep. of Argentina, 892 F.Supp.2d 530, 533 (S.D.N.Y. 2012) (finding an Argentinean natural gas company's core functions were "predominantly commercial"—despite its "function[ing] in accordance with the policies and goals of the Republic [of Argentina]"—because its

"primary function is to sell natural gas at low prices in Argentina").

I note that my conclusion that PEP is an "agency or instrumentality" of the State of Mexico is entirely consistent with holding—for personal jurisdiction purposes—that PEP is a "foreign sovereign" rather than merely a "foreign corporation" under First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("Bancec"), a holding of my colleagues that I join.

The core of the venue dispute, however, is whether PEP is "doing business" in New York. This language suggests that some substantial activity of a commercial nature be engaged in by the defendant and that the activity be more than an isolated instance. Significance and continuity must, therefore, be found. Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000). In the present matter, PEP has served as a guarantor for thirty-five of PEMEX's bond issuances in New York—guaranteeing the payment of all principal and interest in the amount of $9.5 billion—and has served as the agent for service of process for each of those issuances. This significant, continuous course of commercial activity and presence in New York for litigation purposes easily satisfies the pertinent language of Section 1391(f)(3).

PEP argues, however, that "doing business" must be defined narrowly in light of a purported "settled" meaning given to those words in the context of personal jurisdiction (but before the decision Int'l Shoe Co. v. Wash., 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Similarly, PEP notes that, when Congress enacted FSIA in 1976, it based Section 1391(f)(3) on 28 U.S.C. § 1391(c), which, at the time, provided that "[a] corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing

business." S. Rep. No. 94-1310, at 31 (1976); H.R. Rep. No. 94-1487, at 32 (1976). PEP relies upon some non-FSIA cases rendered under the old Section 1391(c) that "consistently rejected efforts to rely on a company's participation in the New York financial markets in order to establish venue under" Section 1391(c). Br. of Appellant at 28.

Contrary to PEP's suggestion, "doing business" for purposes of Section 1391(c) was historically far from clearly defined. See 14D Wright & Miller, Fed. Prac. & Proc. § 3811 n.16 (4th ed.) ("This aspect of the statute [the phrase "doing business"] proved the most difficult to construe."); see also 1 William H. Manz, Foreign Sovereign Immunities Act of 1976 with Amendments: A Legislative History of Pub. L. No. 94-583, 48 (2000) ("[I]t is difficult to say where [instrumentalities] 'reside' under the corporate standards of '. . . doing business' used in section 1391(c)."). Indeed, "[t]here was never an exact formula under which the question of 'doing business' was decided," although "[m]ore than a single or casual transaction was required before the corporation was regarded as doing business in the district for federal venue purposes." Wright & Miller, Fed. Prac. & Proc. § 3811 n.16.

The language of the statute governs our interpretation. See In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98, 112–24 (2d Cir. 2016). I find no difficulty in holding that serving as the guarantor of $9.5 billion raised in thirty-five bond issuances and agreeing to be served process in New York regarding enforcement of the guarantees is "doing business" in New York. The quantum of business is significant, the number of transactions easily supports a finding of continuity, and the agreement to be served process in connection with this activity nails down PEP's

presence in New York for purposes of Section 1396.

That conclusion is consistent with current caselaw. In Altmann v. Rep. of Austria, the Ninth Circuit held that an Austrian art gallery owned by the Austrian government was "doing business" in the Central District of California for venue purposes because the gallery's publications and advertisements had been distributed in that District, even though the gallery did not directly publish the materials in California. 317 F.3d 954, 972 (9th Cir. 2002), opinion amended on denial of reh'g, 327 F.3d 1246 (9th Cir. 2003), and aff'd on other grounds, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). The Ninth Circuit suggested that "doing business," despite not being defined by FSIA, is essentially synonymous with "commercial activity," which is defined. See id. (noting with evident agreement that the "district court [had] found 'no authority that suggests that a foreign agency or instrumentality that engages in 'commercial activity' within a district is not also 'doing business' within a district' ") (quoting Altmann v. Rep. of Austria, 142 F.Supp.2d 1187, 1215 (C.D. Cal. 2001)).

No decision seems to be in conflict with Altmann. Cf. Arch Trading Corp. v. Rep. of Ecuador, 2015 WL 3443906, *4 (S.D.N.Y. May 28, 2015) (providing little examination of § 1391(f)(3) but finding an Ecuadoran state owned bank was not "doing business" in the United States when it merely provided loans to Ecuadoran citizens who had been living abroad on their return to Ecuador); Ocean Faith Shipping Co., Ltd. v. Union of India Food Corp. of India, 1996 WL 227827, at *2 (E.D.La. May 3, 1996) (providing little examination of § 1391(f)(3) but finding that state owned grain shipper was not necessarily "doing business" in New Orleans simply because "the port of New Orleans exports more grain than any port in the world"—a direct connection had to be shown); Shirobokova v. CSA Czech Airlines, Inc., 335 F.Supp.2d 989, 991 (D. Minn. 2004) (finding that code sharing arrangement between airlines were insufficient to establish venue under the "doing business" test in the absence of a physical presence in Minnesota and airline operations in the state).

As the district court found, PEP engaged in "systematic, deliberate corporate activity . . . to obtain funds for its operational activities through its parent in New York, and [PEP had] established a presence for the purpose of obtaining these funds in New York." Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción, No. 10–cv–00206 (AKH), ECF No. 47, at *25 (S.D.N.Y. Aug. 26, 2010). Serving as a guarantor for thirty-five bond issuances and agreeing to accept service of process for those issuances is a substantial "commercial" activity.

Other precedent also supports my conclusion. For example, in Rep. of Argentina v. Weltover, Inc., the Supreme Court held that Argentina was engaged in "commercial activity" when it issued bonds in the United States. 504 U.S. 607, 609–14, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); see also Jackson v. People's Rep. of China, 550 F.Supp. 869, 873 (D.Ala. 1982) (applying the commercial activity exception to bonds issued by China on the basis that "[i]t is clear that the sale, issuance for sale and authorization of issuance for sale in the United States constitutes a 'commercial activity' "). Likewise, in Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, we concluded that the Federal Republic of Germany's assumption of liability for West German bonds issued in the United States was "commercial activity" under FSIA. 615 F.3d 97, 107 (2d Cir. 2010).

c) Conclusion

I therefore concur in the result.