14-597(L)
*Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

August Term, 2014

(Argued: April 1, 2015    Decided:  July 20, 2017)

Docket Nos. 14-597, 14-1052, 14-1497

---

THAI-LAO LIGNITE (THAILAND) CO., LTD., HONGSA LIGNITE (LAO PDR) CO., LTD.,

*Petitioners-Appellants–Cross-Appellees*,

–v.–

GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC,

*Respondent-Appellee–Cross-Appellant.*

---

B e f o r e :

KATZMANN, *Chief Judge*, POOLER, and CARNEY, *Circuit Judges*.

---

Appeal from orders of the United States District Court for the Southern District of New York (Wood, *J.*), vacating its August 3, 2011 judgment enforcing an arbitral award (the "Award") against the Government of the Lao People's Democratic Republic ("Laos"), and denying the requests of Petitioners-Appellants Thai-Lao Lignite (Thailand) Co., Ltd. ("TLL"), and Hongsa Lignite (Lao PDR) Co., Ltd. ("HLL"), that Laos post security pending conclusion of the motion to vacate and any subsequent appeals, and that the court enforce an English judgment also entered on the same

Award. The District Court entered its judgment enforcing the Award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, *implemented by* 9 U.S.C. §§ 201-08 (the "New York Convention" or "Convention"). It vacated its enforcement judgment upon Laos's motion under Federal Rule of Civil Procedure 60(b)(5), made over one year later, after a court in the Malaysian arbitral seat set aside the Award. The District Court did so on the understanding that in the circumstances of this case the Convention required it to give effect to the later Malaysian decision annulling the Award. Petitioners argue that, in so construing its obligations, the District Court exceeded the permissible bounds of its discretion. Had the court examined and accorded appropriate weight to standard Rule 60(b) considerations—including whether the motion was brought within a reasonable time, whether the moving party acted equitably, and whether vacatur strikes an appropriate balance between serving the ends of justice and preserving the finality of judgments— the District Court would have been bound, they argue, to deny Laos's vacatur motion. The untimeliness of Laos's appeal of the Award and Laos's allegedly inequitable conduct in Malaysia and before the District Court compel that result, they contend.

We agree with Petitioners that Rule 60(b)(5) applies to a district court's consideration of a motion to vacate a judgment under the circumstances of the instant case. In adjudicating a Rule 60(b)(5) motion to vacate a judgment enforcing an arbitral award that has, since the initial confirmation, been annulled in the primary jurisdiction, district courts should analyze the full range of Rule 60(b) considerations, including timeliness and the equities. In conducting this analysis, district courts ought to assign significant weight to the concerns of international comity recently articulated in *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016), *cert. dismissed*, 137 S. Ct. 1622 (2017). In the instant case, however, consideration of these factors would not have materially changed the outcome, especially in light of the District Court's explanations of its rulings granting vacatur and denying sanctions. We therefore AFFIRM the District Court's decision to vacate its earlier judgment enforcing the Award.

We further decide that the District Court committed no abuse of discretion by denying Petitioners' requests that Laos be required to post security during the pendency of its motion and any subsequent appeals and that the court enforce the English judgment. Accordingly, we AFFIRM these two orders as well.

AFFIRMED.

JAMES E. BERGER (Charlene C. Sun, J. Emmett Murphy,
       Nilufar Hossain, Kerianne Tobitsche, *on the brief*),
       King & Spalding LLP, New York, NY, *for Petitioners-
       Appellants–Cross-Appellees*.

ROBERT K. KRY (Steven F. Molo, Joel M. Melendez,
       MoloLamken LLP, New York, NY; David J. Branson,
       Anthony F. King, Tiana A. Bey, King Branson LLC,
       Bethesda, MD; Anthony J. Hatab, Dressel & Hatab,
       P.C., New York, NY, *on the brief*), *for Respondent-
       Appellee–Cross-Appellant*.

SUSAN L. CARNEY, *Circuit Judge*:

This case requires us to address how a district court should adjudicate a motion

to vacate a judgment that it has entered enforcing a foreign arbitral award, when that

award has later been set aside by courts in the arbitral seat. In particular, we consider

the interplay between Federal Rule of Civil Procedure 60(b)(5), which permits district

courts to "relieve a party . . . from a final judgment" when the judgment "is based on an

earlier judgment that has been reversed or vacated," on the one hand, and the standards

for declining to enforce an arbitral award under the Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, on the other.

Briefly, the question arises in the following context. In 2007, Petitioners Thai-Lao

Lignite (Thailand) Co., Ltd. ("TLL") and its subsidiary, Hongsa Lignite (Lao PDR) Co.,

3

Ltd. ("HLL") (collectively, "Petitioners") submitted to arbitration in Malaysia a commercial dispute arising from the terminations by the Government of the Lao People's Democratic Republic ("Laos") of contracts granting TLL rights to mine lignite (a soft coal) in the Hongsa region of Laos and to build a major lignite-burning power plant there—an extensive project undertaken during the early 1990s. In late 2009, a duly convened arbitral panel found Laos in breach and awarded Petitioners approximately $57 million as compensation for their losses (the "Award"). After the period for challenging the Award in Malaysia expired, Petitioners began enforcement actions against Laos in the United States, the United Kingdom, and France under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, *implemented by* 9 U.S.C. §§ 201-08 (the "New York Convention" or "Convention"). Their enforcement efforts succeeded in the United States and the United Kingdom, resulting first in an August 2011 judgment in the United States District Court for the Southern District of New York (the "August 2011 judgment") and, later, a November 2012 judgment in the High Court of Justice of England and Wales (the "English judgment").

In October 2010, almost one year after the Award was issued and nine months after a challenge was due, Laos moved in Malaysia for an extension of time within

4

which to file its request to set aside the Award. The Malaysian courts eventually granted Laos's motion and then, in 2012, set aside the Award. Returning to the United States with the Malaysian judgment in hand, Laos moved under Federal Rule of Civil Procedure 60(b)(5) to vacate the District Court's August 2011 judgment enforcing the Award.

Rule 60(b) provides that, "[o]n motion and just terms, the court may relieve a party . . . from a final judgment" for certain specified reasons, one of which is set forth in Rule 60(b)(5): that "the judgment . . . is based on an earlier judgment that has been reversed or vacated." Fed. R. Civ. P. 60(b). Petitioners urged the District Court to deny Laos's motion to vacate, citing (among other conduct) Laos's delay in Malaysia in challenging the Award and its dilatory tactics in discovery matters arising in the U.S. litigation—conduct that Petitioners argued was so egregious that it should bar Laos from obtaining the equitable relief of vacatur.

The District Court rejected Petitioners' arguments, concluding that the New York Convention left it with exceedingly limited discretion: in essence, it was bound to give effect to the Malaysian annulment unless doing so would offend basic standards of justice in the United States. Finding that neither Laos's conduct nor anything in the Malaysian courts' reasoning so tainted the Malaysian order such that vacatur would

5

offend fundamental standards of justice, the District Court granted Laos's Rule 60(b)(5) motion. In related rulings, the District Court also denied Petitioners' later application to enforce the English judgment, on grounds that the English judgment conflicted with the presumptively dominant Malaysian judgment, and it rejected Petitioners' request for security from Laos to protect their interest in the Award during the pendency of its Rule 60(b) motion and any subsequent appeals.

Petitioners now appeal these orders. Because our determination of this appeal rests in part on our decision in *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción* ("*Pemex*"), we have held our ruling in this matter pending our decision and resolution of the petition for certiorari in that case. 832 F.3d 92 (2016), *cert. dismissed*, 137 S. Ct. 1622 (2017).

The New York Convention adopts an approach that does not require a party seeking enforcement of an award in what is known as a "secondary jurisdiction" (here, the United States) to await the conclusion of all appeals of the award that may be pursued in the "primary jurisdiction" (here, Malaysia). While uniquely empowering courts in the primary jurisdiction to set aside or annul an arbitral award, the Convention also anticipates that an arbitral party that has prevailed may sue elsewhere to enforce an award before the award has been reviewed by courts in the arbitral seat.

6

Thus, Article V of the Convention addresses one scenario that grows out of that approach: when the prevailing party files an action to enforce the award in a secondary jurisdiction and then, the primary jurisdiction sets aside the award, Article V(1)(e) declares that a court of a secondary jurisdiction "may" refuse to enforce the award, N.Y. Convention art. V(1)(e), in contrast to the general directive that such a court "shall" enforce the award, *id.* art. III.

In *Pemex*, our Court recently addressed how district courts should evaluate an enforcement petition when the arbitral award has been annulled in the primary jurisdiction. There, we ruled that although Article V(1)(e)'s permissive language could be read to suggest that a district court has "unfettered discretion" as to whether to enforce such an award, the court's exercise of that discretion should rather be treated as "constrained by the prudential concern of international comity." *Pemex*, 832 F.3d at 106. *Pemex* also carved out a "public policy" exception to the comity principle for occasions when enforcing an arbitral award annulled in the primary jurisdiction is needed "to vindicate 'fundamental notions of what is decent and just' in the United States." *Id.* at 107 (quoting *TermoRio S.A. E.S.P. v. Electranta SP.*, 487 F.3d 928, 938 (D.C. Cir. 2007)); *see also Baker Marine (Nig.) Ltd v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197 n.3 (2d Cir. 1999); *Ackermann v. Levine*, 788 F.2d 830, 837, 841 (2d Cir. 1986).

In *Pemex*, however, we did not have occasion to consider the interaction between Rule 60(b)(5) and the primary jurisdiction's annulment of an arbitral award. We now consider that interaction. We decide that Rule 60(b)(5) applies to a district court's consideration of a motion to vacate a judgment enforcing an arbitral award that has since been annulled in the primary jurisdiction. In conducting a Rule 60(b)(5) analysis, district courts should analyze the full range of Rule 60(b) considerations, including timeliness and the equities. In conducting this analysis, courts—in accordance with *Pemex*—ought to assign significant weight to considerations of international comity in the absence of a need to vindicate "'fundamental notions of what is decent and just' in the United States." *Pemex*, 832 F.3d at 107 (quoting *TermoRio*, 487 F.3d at 938). In the instant case, however, more explicit consideration of these factors would not have materially changed the District Court's decision to vacate its prior judgment, especially in light of the District Court's explanations of its rulings granting vacatur and denying sanctions.

We therefore AFFIRM the District Court's order vacating the judgment. We further conclude that the District Court did not exceed the permissible bounds of its discretion in refusing to order Laos to post security during the pendency of its Rule 60(b) motion and any subsequent appeals, nor did it err by refusing to enforce the

English judgment. Accordingly, we also AFFIRM the District Court's order denying the requested security, and we AFFIRM its order denying enforcement of the English judgment.

## BACKGROUND

### I.    The Award

We draw the following statement of facts primarily from the text of the Award. The facts are largely undisputed by the parties; any differences are noted.

In the early 1990s, TLL (a Thai corporation) and its subsidiary HLL (a Laotian corporation partly owned by a state-owned enterprise of Laos) worked with Laos to develop plans for mining lignite in the Hongsa region of Laos, in the northwest area of the country, near the Thai border. The mining operations were intended to enable and support the parties' construction and operation of a power plant that would generate electricity for sale primarily in and to Thailand. In furtherance of these plans, in 1992 and 1993 TLL entered into successive contracts with Laos (the "Mining Contracts"), in which, among other things, Laos granted TLL the right to conduct certain survey and mining operations in the Hongsa region, and TLL undertook to do so and to form HLL. In 1994, TLL and Laos entered into an additional contract (the "Project Development Agreement" or "PDA"), in which Laos granted TLL the right to build at its own expense

9

and to manage a plant to be located near the mines, that would use the mine's coal production to generate electrical power.

In the early phases of the Hongsa project, Petitioners performed geological surveys, purchased equipment, and built a road to access the envisioned mine. They also tried to secure project financing from outside sources and to negotiate a power purchase agreement with the government of Thailand. In 1997, however, funding negotiations fell apart and resources for the project began to dry up when the region was beset by severe economic troubles. These lasted from 1997 roughly through 2000, and came to be known as the Asian Financial Crisis.

By 2006, after one of Petitioners' attempts to obtain additional funding came to naught, Laos wrote to TLL, expressing its concerns that Petitioners would be unable to fulfill their obligations under the PDA. According to Laos, Petitioners failed adequately to address Laos's concerns, and, accordingly, after sending a notice of default in September 2006, by letter dated October 5, 2006, Laos sent Petitioners a notice terminating the PDA. This missive was followed shortly by a second letter, in which Laos announced its termination of the Mining Contracts as well. According to Petitioners, in doing so Laos both failed to comply with the PDA's termination procedures and terminated the agreements without cause, thus breaching the PDA.

Efforts to settle the matter failed. The PDA provided that any dispute arising out of that agreement would be submitted to arbitration in Kuala Lumpur, Malaysia, and conducted under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules. The Mining Contracts, in contrast, provided that disputes would be resolved by the Laotian Board of Economic Conciliation, the Laotian Court, or the International Economic Dispute Settlement Organization.

In June 2007, Petitioners initiated arbitral proceedings in Malaysia. The dispute was heard by a panel of three U.S. lawyers (the "Panel") in Kuala Lumpur in July 2009. In November 2009, the Panel issued a 48-page written award, finding for Petitioners. The Panel ruled that Petitioners' lack of success in raising funds following the Asian Financial Crisis did not put them in breach of the PDA. It further concluded that Laos breached the PDA by not properly terminating that agreement. It therefore found Laos liable to Petitioners for damages caused by the breach, and, after reviewing cost estimates submitted by all parties, concluded that Petitioners were entitled to reimbursement of $40 million in total investment costs. This sum represented amounts that Petitioners "reasonably and unavoidably actually expended out-of-pocket in the normal course of preparation for performance or in performance up until the date of breach," J.A. 149, including the cost of conducting initial mining surveys and building a

11

road to the site (expenses that, according to Laos, predated the PDA). In addition, the Panel awarded Petitioners a "premium" of $4 million (an "allowance for a reasonable return on Claimants' total investment costs," contemplated by the PDA), J.A. 157, interest, and attorney's fees, for a total award of $57,210,000, J.A. 161.

Under Malaysian law, any application to set aside an arbitral award "may not be made after the expiry of ninety days from the date on which the party making the application had received the award." J.A. 2338 (reproducing Laws of Malaysia, Arbitration Act 2005, Act 646, Section 37(4)). Laos received the Award on November 4, 2009. The ninety-day period for an application to set aside an award thus expired in early February 2010. Laos made no set-aside application during that period.

## II.    Petitioners' efforts to enforce the Award

In the summer of 2010, Petitioners began efforts to enforce the Award under the New York Convention. The Convention governs the "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." N.Y. Convention art. I. Signatories agree to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III.

12

The Convention "mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made, and (2) in other states where recognition and enforcement are sought." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). The state in which or under whose laws an award is made is referred to as the "primary jurisdiction," while all other signatory states are considered "secondary jurisdictions." *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007); W. Michael Reisman & Heide Iravani, *The Changing Relation of National Courts and International Commercial Arbitration*, 21 Am. Rev. Int'l Arb. 5, 12 (2010). The Convention conceives of a secondary jurisdiction's review of an award as relatively limited: Article III of the Convention provides that the secondary jurisdiction "shall" enforce the award unless the party opposing enforcement furnishes proof that one (or more) of seven exceptions described in Article V obtains. *See* N.Y. Convention arts. III, V. The obligations on U.S. courts that the Convention imposes as to the enforcement of foreign arbitral awards are stated in Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08. As relevant here, Section 207 directs that "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

Petitioners began one effort to enforce the Award in the United States. In June 2010, they filed an action in New York state court seeking confirmation of the Award. Laos removed the action to the United States District Court for the Southern District of New York, and then moved to dismiss the action. It argued against enforcing the Award, asserting primarily that the arbitral panel exceeded its jurisdiction when it resolved disputes subject to the Mining Contracts, not just the PDA, and when it incorporated costs incurred under those contracts into its Award, and that these errors invalidated the Award.

The District Court rejected this argument and on August 5, 2011, entered judgment enforcing the Award. The court concluded that Laos's objections did not "raise issues of jurisdiction or arbitrability," as required to fall within one of Article V's grounds for non-enforcement (or another applicable ground), "but rather concern[ed] the Panel's interpretation of the PDA and its calculation of damages." *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, No. 10 Civ. 5256, 2011 WL 3516154, at *15 (S.D.N.Y. Aug. 3, 2011). The District Court further advised that, even if Laos's objection was properly construed as a jurisdictional challenge, it would not refuse to enforce the Award on that basis, because in its view "the parties agreed to

14

delegate questions of arbitrability and jurisdiction to the Panel" and the Panel had decided that those matters were within its jurisdiction. *Id.*

Laos then appealed that decision to this Court. We affirmed the District Court's judgment by summary order, ruling that the District Court committed no abuse of discretion in deferring to the Panel's jurisdictional decision. *Thai-Lao Lignite (Thailand) Co. Ltd. v. Gov't of Lao People's Democratic Republic*, 492 F. App'x 150, 151-52 (2d Cir. 2012).

While the enforcement action was proceeding in New York, Petitioners were also attempting to enforce the Award in the United Kingdom and in France. They enjoyed some success. In July 2010, shortly after the New York action was filed, the High Court of Paris entered judgment for Petitioners enforcing the Award. (This judgment was later reversed, however, by the Court of Appeal of Paris, which concluded that the Panel had improperly ruled on matters outside the scope of the arbitration agreement.) And in November 2012, after we affirmed the District Court's August 2011 judgment, the High Court of Justice of England and Wales entered judgment enforcing the Award as well.

With the English judgment in hand, Petitioners filed a second action in the Southern District of New York in February 2013, asking the District Court to enforce the

English judgment under New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. CPLR 5301-09.

### III. Laos's efforts to set aside the Award

In early October 2010, in addition to opposing Petitioners' action for enforcement of the Award, Laos requested that the District Court stay the proceeding and represented to the court that it had moved in Malaysia to set aside the Award. Within days, however, it came to light that Laos's Malaysian counsel had not yet filed its set-aside action in Malaysia. Upon that revelation and the parties' ensuing charges and retorts, Laos withdrew its request for a stay and the District Court proceeded to consider the enforcement action.

Later in October, shortly after this kerfuffle, Laos in fact initiated proceedings in Malaysia to set aside the Award. Because its time to appeal the Award had expired in early February 2010, *see* J.A. 2338, Laos sought an extension of this time from the Malaysian High Court. Laos explained that it was unaware of this deadline when it allowed the time to challenge the Award to lapse nine months earlier, and requested to be relieved of the effect of its errors.

The Malaysian High Court initially denied Laos's application, but the Court of Appeal of Malaysia reversed, finding an extension appropriate for a foreign sovereign

16

when, as here, the delay was the result of the sovereign's asserted lack of knowledge of the local law and inadequate advice from its legal advisors. Commenting that to "[r]efus[e] the extension of time" would be "tantamount to shutting out the Government of Laos from challenging [the] award," J.A. 976, the Court of Appeal granted the request and remanded the case to the High Court for consideration of the merits.

On December 27, 2012, almost one and one-half years after the District Court entered the August 2011 judgment enforcing the Award, the Malaysian High Court annulled the Award and ordered re-arbitration of the dispute before a new panel. The High Court acknowledged that courts in the United States and the United Kingdom had rejected Laos's jurisdictional challenge to the Panel's Award, but ruled that, in its view, the Panel had exceeded its jurisdiction by addressing disputes arising not just under the PDA, but under the Mining Contracts as well. The High Court concluded that the Award amount, which included costs borne by HLL and other subsidiaries not parties to the PDA, had impermissibly "lumped together or co-mingled the claims and disputes under the Mining Contracts with the claims and disputes under the PDA." J.A. 1572. (On review in early 2014, the Malaysian Court of Appeal affirmed the High Court's judgment.)

17

Armed with the High Court's set-aside judgment, on February 11, 2013—one month and a half after the High Court annulled the Award and one year and a half after the District Court entered the original enforcement judgment—Laos moved under Federal Rule of Civil Procedure 60(b)(5) to vacate that judgment. Petitioners objected, urging primarily two grounds for denying vacatur. First, Petitioners challenged various aspects of the Malaysian Court of Appeal's order granting Laos an extension of time within which to challenge the Award and the merits of the High Court's subsequent set-aside judgment. Second, Petitioners claimed that Laos's litigation conduct in Malaysia and in the United States, which it characterized as inequitable, should preclude Laos from receiving Rule 60(b) relief.

On February 6, 2014, just weeks after the Malaysian Court of Appeal affirmed the High Court's set-aside judgment, the District Court granted Laos's Rule 60(b)(5) motion and vacated its August 2011 judgment. *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, 997 F. Supp. 2d 214 (S.D.N.Y. 2014). The District Court held that, under the New York Convention, it was required to give effect to the Malaysian court's set-aside judgment and vacate the August 2011 judgment unless giving effect to the judgment would violate our "fundamental notions of what is decent and just." *Id.* at 221 (quoting *TermoRio*, 487 F.3d at 939). Applying this standard, the

District Court held that Laos's alleged misconduct in the Malaysian proceedings and the purported errors in the Malaysian courts' reasoning did not "rise to the level of violating basic notions of justice such that [it] should ignore comity considerations and disregard the Malaysian judgments." *Id.* at 223. The District Court therefore vacated its August 2011 judgment and denied Petitioners' additional request that Laos be required to post suitable security for the judgment during the pendency of an appeal. *Id.* at 227-28.

The District Court turned separately to Petitioners' action to enforce the English judgment under New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. CPLR 5301-09, and in March 2014, the court denied Petitioners' application. The District Court pointed out that New York law afforded it discretion to refuse to recognize a foreign judgment "if . . . the judgment conflicts with another final and conclusive judgment." *See* N.Y. CPLR 5304(b)(5). The Court found that the English judgment enforcing the Award conflicted with the Malaysian judgment annulling the Award and concluded "that the later Malaysian judgment should have priority because Malaysia, as the seat of the arbitration and therefore the primary jurisdiction under the New York Convention, had the sole authority to determine whether the arbitral award

was valid and, if not, to set it aside." J.A. 2925. The Court denied Petitioners' application

and directed the clerk of court to close the case.

Petitioners timely appealed.

## DISCUSSION

Petitioners challenge three orders entered by the District Court: (1) its grant of

Laos's Rule 60(b)(5) motion to vacate the August 2011 judgment; (2) its denial of

Petitioners' request that Laos, as the moving party, post a security bond during the

pendency of its Rule 60(b) motion and any subsequent appeals; and (3) its denial of

Petitioners' application to enforce the English judgment. Each ruling was committed to

the District Court's discretion. *See In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353,

357 (2d Cir. 2013) (decision on Rule 60(b) motion in district court's discretion); *Haberman*

*v. Tobin*, 626 F.2d 1101, 1104 (2d Cir. 1980) (request for a security in district court's

discretion); *Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi*, 10 N.Y.3d 243, 248

(N.Y. 2008) (refusal to enforce under N.Y. CPLR 5304(b)(5) in court's discretion). Insofar

as these orders rested on a decision to extend or deny comity to the courts of a foreign

sovereign, we review such decisions for abuse of discretion as well. *See Pemex*, 832 F.3d

at 100. A court abuses its discretion when "(1) its decision rests on an error of law (such

as application of the wrong legal principle) or a clearly erroneous factual finding, or (2)

20

its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

We address each of the challenged orders in turn. For the reasons set forth below, as to the Rule 60(b)(5) motion, we affirm the District Court's order vacating the August 2011 judgment. We then turn briefly to the challenges posed to the remaining two orders, and conclude that the District Court acted within the permissible bounds of its discretion in refusing to require Laos to post security and in denying recognition of the English judgment.

## I. Laos's Rule 60(b)(5) motion to vacate the August 2011 judgment

Petitioners argue that the District Court erroneously failed to consider the full range of interests protected by Rule 60(b) when it ruled on Laos's vacatur motion, and that it should have assigned greater—even dispositive—adverse weight to Laos's untimeliness in seeking review of the Award and other inequitable conduct.

Federal Rule of Civil Procedure 60 "prescribes procedures by which a party may seek relief from a final judgment." *House v. Sec'y of Health & Human Servs.*, 688 F.2d 7, 9 (2d Cir. 1982). Rule 60(b) provides that, "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" if

21

one of several enumerated bases for relief is established. Fed. R. Civ. P. 60(b).[1] One such

basis for relief is that the judgment from which relief is sought "is based on an earlier

judgment that has been reversed or vacated." Fed. R. Civ. P. 60(b)(5). As we noted

earlier, the decision whether to grant such relief is addressed to the sound discretion of

the district court. *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d at 357.

In exercising that discretion, courts aim to "strike[] a balance between serving the

ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58,

61 (2d Cir. 1986). In service of the latter interest, Rule 60(c) requires that a motion for

---

[1] Rule 60(b) and (c), both relevant here, provide in their entirety:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>> (4) the judgment is void;
>> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>> (6) any other reason that justifies relief.
>
> (c) Timing and Effect of the Motion.
>> (1) *Timing*. A motion under Rule 60(b) must be made within a reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding.
>> (2) *Effect on Finality*. The motion does not affect the judgment's finality or suspend its operation.

relief under Rule 60(b) be made "within a reasonable time." Fed. R. Civ. P. 60(c). This is to be determined based on "the particular circumstances of the case," taking into account the reason for any delay, the possible prejudice to the non-moving party, and the interests of finality. *PRC Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 897 (2d Cir. 1983) (discussing Rule 60(c) reasonableness of timing in context of Rule 60(b)(6) motion). In addition, because vacatur under Rule 60(b) is an equitable remedy, courts may deny Rule 60(b) relief if the moving party is found to have acted inequitably. *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 127 (2d Cir. 2009). The burden is on the moving party to demonstrate that it is entitled to relief, and courts "[g]enerally . . . require that the evidence in support of the motion to vacate a final judgment be highly convincing." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987) (internal quotation marks omitted). Careful attention to these considerations and to whether the movant is entitled to relief in the particular circumstances of each case ensures that Rule 60(b) will "be broadly construed to do substantial justice," while respecting that "final judgments should not be lightly reopened." *Nemaizer*, 793 F.2d at 61 (internal quotation marks omitted).

Article III of the Convention places on each contracting state the obligation to "recognize arbitral awards as binding and enforce them in accordance with the rules of

procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." N.Y. Convention art. III. Article V acknowledges certain exceptions to that obligation. Thus, Section 1(e) of Article V provides:

> Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that: . . . (e) [t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

*Id.* art. V(1)(e). For ease of reference, we set out the full text of Article V in the margin.[2]

---

[2] Article V provides in full:

> 1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>   (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>   (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>   (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

Although Article V(1)(e)'s text appears to leave the District Court with discretion to enforce an award that has been annulled in the primary jurisdiction—after all, it does not say that enforcement of the award "must" be refused—the D.C. Circuit in *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928 (D.C. Cir. 2007), held, and we recently agreed in *Pemex*, that the scope of that discretion is "constrained by the prudential concern of international comity." *Pemex*, 832 F.3d at 106; *TermoRio*, 487 F.3d at 938-39. In *TermoRio*, the D.C. Circuit ruled that courts considering whether to enforce an award that has been set aside in the primary jurisdiction should give effect to a judicial decision of the primary jurisdiction unless enforcement of that judgment would offend the public policy of the state in which enforcement is sought. *TermoRio*, 487 F.3d at 938-39. The D.C. Circuit acknowledged that our Court "implicitly endors[ed]" this "'public policy'

---

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

25

gloss on Article V(1)(e)" in *Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999), where we suggested that offense to public policy might provide an adequate reason to refuse to recognize a judgment of a foreign court. *TermoRio*, 487 F.3d at 937 (citing *Baker Marine*, 191 F.3d at 197 n.3). The D.C. Circuit expanded on *Baker Marine*, however, holding that "a foreign judgment is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the United States," a standard drawn from the Restatement (Second) of Conflict of Laws § 117 (1971) and cases interpreting Article V(2)(b)'s "public policy" exception to enforcement of an award. *Id.* at 938-39 (internal quotation marks omitted).

In *Pemex*, we adopted this view of the scope of our courts' discretion under Article V(1)(e), concluding that refusal to recognize a foreign judgment nullifying an award is "appropriate only to vindicate 'fundamental notions of what is decent and just' in the United States." *Pemex*, 832 F.3d at 106 (quoting *TermoRio*, 487 F.3d at 938). *Pemex*, of course, found that in the "rare circumstances" of that case it would *not* be an abuse of discretion to reject the demands of comity in favor of honoring public policy. *Id.* at 111. But it nonetheless recognized a strong presumption in favor of following the primary jurisdiction's ruling. *Id.* ("Any court should act with trepidation and reluctance in

26

enforcing an arbitral award that has been declared a nullity by the courts having jurisdiction over the forum in which the award was rendered.").

In *Pemex*, we did not have occasion to consider the interaction between Rule 60(b) and the primary jurisdiction's annulment of an arbitral award. The arbitral award that was our focus in *Pemex* was annulled in the primary jurisdiction (Mexico) while the district court's judgment confirming the award was on appeal to this Court. *See Pemex*, 832 F.3d at 99-100. This Court, upon motion by the party that had opposed confirmation of the award (Pemex), vacated the district court's judgment confirming the award and remanded for further proceedings in light of the intervening Mexican court decision nullifying the award. *See Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción*, No. 10-4656-cv, 2012 WL 9346475, at *l (2d Cir. Feb. 16, 2012). On remand, the district court granted the "renewed motion to confirm the [a]ward" made by the award creditor (COMMISA), finding that the nullification of the award in Mexico "violated basic notions of justice." *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de* C. *V. v. Pemex-Exploración y Producción*, 962 F. Supp. 2d 642, 661 (S.D.N.Y. 2013). We affirmed. *See Pemex*, 832 F.3d at 97.

In the instant case, by contrast, this Court had already affirmed the District Court's judgment confirming the arbitral award by the time the award was set aside in

27

Malaysia, and the District Court was presented with a motion pursuant to Rule 60(b)(5) to vacate its judgment confirming the arbitral award. This case raises the question, then, of how the Rule 60(b)(5) inquiry should proceed when the judgment sought to be vacated is one confirming an arbitral award that was subsequently vacated in the primary jurisdiction.

Petitioners argue that the District Court erred as a matter of law in exercising its discretion by giving presumptive effect to the foreign set-aside judgment over its own duly entered judgment. Treating the foreign judgment as conclusive fails to accord any weight to the need to preserve the finality of judgments that Rule 60(b) protects, they assert. They contend further that the court's heavy deference improperly placed on them the burden to demonstrate that the judgment should *not* be vacated, whereas—in light of the entry of judgment on the Award more than a year earlier—the burden should have been assigned to Laos to demonstrate entitlement to Rule 60(b) relief. Laos, in contrast, insists that the New York Convention mandates giving conclusive effect to the Malaysian annulment of the Award, even in this distinct procedural setting.

As an initial matter, our review of the text of the Convention and the applicable provisions of the FAA suggests that Rule 60(b)(5) applies to motions to vacate

judgments confirming arbitral awards that are subsequently set aside in the primary jurisdiction.

We turn first to the text of the Convention.[3] *See Medellín v. Texas*, 552 U.S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). Article III of the Convention requires contracting states to "recognize arbitral awards as binding and enforce them *in accordance with the rules of procedure of the territory where the award is relied upon*, under the conditions laid down in the following articles." N.Y. Convention art. III (emphasis added). In our view, Rule 60(b) is one such "rule of procedure." *See* Fed. R. Civ. P. 60 advisory committee's note to 1946 amendment (describing Rule 60(b) as one "procedure" by which a judgment may be vacated). By this reference, Article III suggests that a court should apply its procedural rules for vacating judgments to its judgments enforcing arbitral awards. Nothing in the language suggests that post-judgment procedures were not encompassed by Article III's phrase.

This reading of the Convention derives additional support from the FAA itself. The FAA applies to judgments entered under the Convention "to the extent the chapter

---

[3] In *Pemex*, we recognized that the FAA "expressly incorporates the terms of the Panama Convention," and turned directly to the text of the Convention to determine the obligations of U.S. courts called on to enforce arbitral awards rendered under the Panama Convention. *Pemex*, 832 F.3d at 105 (citing 9 U.S.C. § 301). Because there is "no substantive difference" between the Panama and New York Conventions, *id.*, and the FAA similarly "expressly incorporates" the terms of the New York Convention, *id.*; *see* 9 U.S.C. §§ 201-08, we follow *Pemex*'s lead and turn to the text of the Convention, with the FAA's procedural directives, as the governing law.

is not in conflict with" Chapter 2 (which codifies the Convention) or the Convention itself. 9 U.S.C. § 208. Thus, Section 13 of Chapter 1 directs that judgments entered under the FAA "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action." 9 U.S.C. § 13. The "provisions of law relating to[] a judgment in an action" include the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 81(a)(6) (providing that the Rules "govern proceedings under" the FAA, "except as [it] provide[s] other procedures"); *cf. ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 114 (2d Cir. 2012) ("[W]here the FAA's procedures are in conflict with those of the civil rules, the former controls."). This observation reinforces our view that Rule 60(b) applies to judgments entered on foreign arbitral awards under the Convention just as it does to judgments entered on domestic arbitral awards. Applying this reasoning, other Courts of Appeals reviewing decisions adjudicating motions to vacate judgments entered on domestic arbitral awards have applied Rule 60(b). *See AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 579 F.3d 1268, 1272 (11th Cir. 2009); *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642 (D.C. Cir. 1996). This approach—applying Rule 60(b) to motions to vacate judgments entered on domestic awards—also applies, we think, to judgments entered under the New York Convention. No part of the Convention as implemented in Chapter 2 of the FAA conflicts with this

30

directive; indeed, Section 13 of the FAA and Article III of the Convention tend to reinforce each other.

Laos acknowledges, in fact, that "Rule 60(b) is consistent with the [New York] Convention." Appellee's Br. 62. The question is then how courts adjudicating a Rule 60(b)(5) motion to vacate a judgment confirming an arbitral award that has been vacated in the primary jurisdiction should proceed. In adjudicating such a motion, district courts should consider the point that "under the Convention, the power and authority of the local courts of the [primary jurisdiction] remain of paramount importance." *Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 22. The annulment of an arbitral award in the primary jurisdiction should therefore be given significant weight. *See Pemex*, 832 F.3d at 107.

In fact, Article V(l)(e) considerations may readily be incorporated into the ordinary course of a court's Rule 60(b) analysis. Courts considering Rule 60(b)(5) motions are generally, and correctly, solicitous of a movant seeking relief when a prior judgment on which the challenged judgment relies has been vacated. *See, e.g., Flowers v. S. Reg'l Physician Servs., Inc.*, 286 F.3d 798 (5th Cir. 2002); *Cal. Med. Ass'n v. Shalala*, 207 F.3d 575 (9th Cir. 2000); *Maul v. Constan*, 23 F.3d 143 (7th Cir. 1994); *cf. Assoc. for Retarded Citizens of Conn., Inc. v. Thorne*, 68 F.3d 547, 553 (2d Cir. 1995) (holding that Rule 60(b)(5)

31

applied to motion for reconsideration of attorney's fees). The prudential concerns for international comity and the high standard for overcoming the presumptive effect of a primary jurisdiction's annulment, as articulated in *Pemex*, fit comfortably within the scope of this solicitude. Of course, consistently with *Pemex*, the party opposing vacatur of a judgment enforcing a later-annulled award may show in support of its opposition that giving effect to the judgment annulling the award would offend "'fundamental notions of what is decent and just' in the United States." *Pemex*, 832 F.3d at 107 (quoting *TermoRio*, 487 F.3d at 938). In the absence of such a public policy concern, however, the annulment of an award in the primary jurisdiction should weigh heavily in a district court's Rule 60(b)(5) analysis.

Nevertheless, in ruling on a Rule 60(b)(5) motion, even in the context of a judgment entered on a foreign arbitral award under the New York Convention, a district court should be guided by the full range of interests protected by Rule 60(b). Courts should consider whether the motion was made within a reasonable time, whether the movant acted equitably, and whether vacatur would strike an appropriate balance between serving the ends of justice and preserving the finality of judgments, as well as the prudential concern for international comity.

The Convention's concern for comity is thus only one of the considerations to be taken into account in deciding a Rule 60(b)(5) motion. Accordingly, courts acting on Rule 60(b)(5) motions that are based on later-annulled arbitral awards must not simply treat the annulment as dispositive of the Rule 60(b)(5) analysis. They should analyze the full range of Rule 60(b) considerations, including the weighty interests served by protecting the finality of judgments of our courts, and must be attentive to the fact that the burden of demonstrating that vacatur is appropriate lies with the party seeking that result. This need not be an onerous burden for the beneficiaries of the annulment, and it need not require too much more from the District Court than was done here. But it does require recognition and consideration of the interests protected by Rule 60(b).

We presume that the District Court, in its diligence, considered the Rule 60(b) factors, but it has not given us the benefit of its analysis. More explicit consideration of a broader range of Rule 60(b) factors by the District Court would have been helpful in the instant case. Our review of the record and of the District Court's actions persuades us, however, that the District Court did not exceed the permissible bounds of its discretion.

First, we observe that over the varied course of the proceedings the District Court gave some explicit consideration to the interests of justice. For example, the District Court noted that the Malaysian judgment annulling the Award "did not leave

33

Petitioners . . . without a remedy" and acknowledged that the dispute would be re-arbitrated before a different panel of arbitrators. *Thai-Lao Lignite*, 997 F. Supp. 2d at 227. This case is thus unlike *Pemex*, where the award was annulled and the laws in the foreign jurisdiction were changed in the interim, precluding any future recovery. *See Pemex*, 832 F.3d at 107-08. Further, as the District Court recognized, the circumstances surrounding the proceedings in Malaysia are far less suspect and therefore more worthy of presumptive recognition, than the circumstances surrounding the proceedings in *Pemex*, where we found that the district court did not abuse its discretion in determining that "basic notions of justice" would be offended by failure to enforce the later-annulled award. *See Thai-Lao Lignite*, 997 F. Supp. 2d at 227. In *Pemex*, we concluded that "[t]he high hurdle of the public policy exception" was "surmounted . . . by four powerful considerations: (1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation." *Pemex*, 832 F.3d at 107. Here, although we might not necessarily agree with the merits of the Malaysian courts' judgments, we see no grounds for such concerns.

Second, none of the allegedly inequitable conduct called to the attention of the District Court justifies denying Laos the relief from enforcement that it requests. Laos's allegedly inequitable conduct falls into several categories. Petitioners' complaints concern primarily Laos's conduct before the Malaysia court. For example, Petitioners object to Laos's delay in filing the action to set aside the Award and its alleged failure to adhere to the PDA's covenant not to challenge an arbitral award. The import of this conduct—largely, the merits of legal positions taken, and not egregious behavior of another sort—was already addressed by the District Court in its order vacating the judgment and rejected by it as an unavailing attempt by Petitioners to challenge the merits of the Malaysian set-aside judgment. *See Thai-Lao Lignite*, 997 F. Supp. 2d at 223-25. The District Court did not assign any weight to the alleged "misconduct" with which Petitioners charged Laos.

In addition, Petitioners criticize Laos for failing to timely comply with the District Court's discovery orders. This conduct has also already been addressed by the District Court in its opinions denying (in large part) Petitioners' motions for sanctions. *See Thai-Lao Lignite*, 997 F. Supp. 2d at 223 n.7 (citing *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic*, 10 Civ. 5256, 2013 WL 3970823 (S.D.N.Y. Aug. 2, 2013); *Thai-Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*,

No. 10 Civ. 5256, 2011 WL 4111504 (S.D.N.Y. Sept. 13, 2011)). In those opinions, the District Court concluded that Laos's objections to its discovery orders did not "evince[] bad faith or serious and studied disregard for the orderly process of justice," as would be required to warrant a sanctions award. *Thai-Lao Lignite*, 2011 WL 4111504, at *11 (internal quotation marks omitted). It found further that Laos's non-compliance was "substantially justified, either because [Laos] took a reasonable (if ultimately mistaken) legal position or because the information sought [was] not available." *Thai-Lao Lignite*, 2013 WL 3970823, at *5. Cumulatively, we think, these findings show that had the District Court considered this conduct more expressly in the context of Laos's Rule 60(b)(5) motion, it would not have viewed the conduct as sufficiently dilatory to justify its continued enforcement of an annulled award. To find otherwise, as Laos points out, and to rule that the conduct entirely precluded the requested vacatur under Rule 60(b)(5), would mean in effect directing the District Court to enter the equivalent of a $57 million sanction against Laos for its misconduct—a steep fine indeed, and one that the record gives no reason to think the District Court would have imposed.

The remaining conduct of which Petitioners complain is best described as either unnecessarily combative or careless. We are not persuaded that it demonstrates the kind of "chutzpah" that has led courts in this Circuit to deny otherwise merited relief, or that

36

the District Court here (judging from its management of the behavior during the proceedings) would have seen as outcome-determinative. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 128 & n.5 (2d Cir. 2009). Our decision in *Uzan* offers an instructive contrast in this regard. There, we affirmed the district court's discretionary denial of a request for Rule 60(b) relief because the movants had not "pursued their defense with clean hands." *Id.* at 127 (internal quotation marks omitted). As we explained, the movants there had "time and again deployed their lawyers to raise legal roadblocks to the enforcement of the judgment against them," and "persistently endeavored to evade the lawful jurisdiction of the District Court and undermine its careful and determined work." *Id.* Despite Petitioners' arguments to the contrary, Laos's behavior in the present litigation falls far short of the persistent disrespect and noncompliance for which we and the district court criticized the unsuccessful movants in *Uzan*. *Id.* at 128 & n.5.

Finally, we address the interest in finality, which protects the prevailing party's (and the courts') tangible interest in avoiding the costs, uncertainty, and even disrespect reflected by repeated and otherwise unfounded challenges to its judgments. *See House*, 688 F.2d at 9 (describing the interest as "ensuring that litigation reaches an end within a finite period of time"). Given these important interests, the timing of a motion to vacate

37

cannot be "irrelevant" to the calculus, as Laos argues.[4] Had ten years elapsed before the set-aside proceedings were concluded, and more time elapsed before Laos moved to vacate the Award, the judicial interests in finality of judgments might well outweigh the deference to the primary jurisdiction presumptively called for by the New York Convention. In this case, however, finality interests did not stand in the way of the District Court's decision to give effect to the Malaysian set-aside judgment and to vacate the District Court's August 2011 judgment. After all, the party seeking to enforce the Award (Petitioners) knew proceedings to set aside the Award in the primary jurisdiction were ongoing before the District Court entered judgment, and the party seeking vacatur (Laos) sought relief promptly after courts in the primary jurisdiction annulled the award.

The record in this case, therefore, reflects that the District Court did not exceed the permissible bounds of its discretion in vacating its August 2011 judgment. The circumstances potentially bearing on the Rule 60(b) motion, although not explicitly

---

[4] That the timing of the motion to vacate an annulled award properly bears on our analysis here finds additional support in Article VI of the Convention. Article VI describes the circumstances in which a party may obtain a stay of enforcement proceedings: it provides that a court considering an application to enforce an award "may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security." N.Y. Convention art. VI. Simply by providing a mechanism to stay an enforcement action, Article VI suggests—contrary to Laos's contention that timing is "irrelevant" to the Convention's enforcement scheme, Appellee Br. 56—that the Convention was not blind to the timing of related actions.

addressed by the District Court in its order, do not bar the District Court from vacating its judgment. Further, no showing has been made that vacatur will offend basic notions of justice in the United States. Thus, for all these reasons, we affirm the District Court's order vacating its judgment confirming the Award.

## II.    Petitioners' request for security

Petitioners argue that the District Court should have required Laos to post security before it granted—or even considered—Laos's Rule 60(b) vacatur motion. Petitioners contend that both Rule 60(b) and the New York Convention empower U.S. courts to require security in these circumstances. Rule 60(b) provides that relief may be granted "[o]n motion and just terms," Fed. R. Civ. P. 60(b), terms that our Court has held to include requiring a bond or security. *See First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989). Further, Petitioners observe that Article VI of the New York Convention gives courts in secondary jurisdictions discretion to order that a party moving to set aside an award provide "suitable security" before the court stays an enforcement action pending the issuance of a set-aside decision in the primary jurisdiction. N.Y. Convention art. VI.

The District Court declined to enter such an order and cited two reasons for its refusal. First, it ruled that requiring Laos, a foreign sovereign, to post security would be

39

tantamount to directing attachment of Laos's assets and would therefore violate the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. § 1610(a) (providing that where a foreign sovereign has waived its sovereign immunity, its property may be attached only if the property is "used for a commercial activity in the United States"). *Thai-Lao Lignite*, 997 F. Supp. 2d at 228-30. Second, the District Court declared that, even if there were no FSIA bar, whether to require Laos to post the security was a decision committed to its discretion and it "would decline to exercise that discretion." *Id.* at 229 n.12. On appeal, Petitioners argue that the FSIA posed no bar to requiring security from Laos and that the District Court should have so required to protect Petitioners' "rights" pending resolution of Laos's motion to vacate the August 2011 judgment. Appellants' Br. 86.

The District Court made clear that even if the FSIA did not preclude it from entering such an order, it would decline in its discretion to do so. We identify no abuse of discretion in that decision and therefore do not address whether the FSIA would bar the District Court from ordering Laos to post security here. *See McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) (holding that a court "need not reach . . . challenges [when] an independent ground for [a] decision remains unchallenged").

Accordingly, we affirm the District Court's order denying Petitioners' motion for a security.

## III. Petitioners' action to enforce the English judgment

Before the Malaysian High Court set aside the Award, Petitioners also obtained a judgment enforcing the Award in England. Petitioners then filed an action before the District Court seeking enforcement of the English judgment under New York's Uniform Foreign Country Money-Judgments Recognition Act, N.Y. CPLR Art. 53. This Act provides that "a foreign country judgment," defined as a "judgment of a foreign state granting or denying recovery of a sum of money," N.Y. CPLR 5301, may be enforced by filing "an action on the judgment," N.Y. CPLR 5303. Laos did not file an answer or otherwise appear, and the Clerk of Court for the Southern District of New York entered a notice of default against it. When Laos later appeared and moved to vacate the default, the District Court, *sua sponte*, directed Petitioners to show cause why it should not dismiss as moot the petition to enforce the English judgment, observing that the English judgment rested heavily on the English court's deference to the now-vacated August 2011 judgment entered in the United States.

After Petitioners responded, the District Court denied their request to recognize the English judgment and closed the case. Citing N.Y. CPLR 5304(b)(5), which provides

41

that "[a] foreign country judgment need not be recognized if . . . the judgment conflicts with another final and conclusive judgment," the district court ruled that it had the discretionary authority to credit the Malaysian judgment annulling the Award over the English judgment enforcing the Award. "[E]quity favors giving the Malaysian judgment priority over the English judgment," it concluded, and on that basis it declined to enforce the English judgment. J.A. 2926.

The English judgment had strong and explicit ties to the District Court's own earlier-entered judgment: the English court noted that the points Laos raised there in opposition to confirming the Award "were raised in the course of the US proceedings . . . and, in effect, rejected by the US District Court and the Court of Appeal[s]." J.A. 1404. Accordingly, the High Court observed that, "as a matter of English law at least, the conclusion of the US courts on these . . . issues would give rise to an issue estoppel." J.A. 1404. These statements underscore the close relationship between the two decisions and support the District Court's decision not to enforce the English judgment.

In their appeal from the District Court's order denying enforcement of the English judgment, Petitioners argue that Laos's default on the English judgment enforcement action precluded the District Court from considering the merits of

Petitioners' enforcement claim, including Laos's possible affirmative defenses. The District Court did not enter a default judgment, however; rather the Clerk of Court for the Southern District of New York had entered only a notice of default against Laos in that action. Fed. R. Civ. P. 55(a), (b)(2).

Petitioners further argue that N.Y. CPLR 5304(b)(5)—the ground for non-recognition that the District Court invoked here—provides only an affirmative defense to enforcement; the District Court, they urge, was not entitled to consider it *sua sponte*. It is not clear, however, that under New York law the discretionary bases for non-recognition of foreign judgments *are* affirmative defenses. Indeed, the relevant provision of New York's Civil Practice Law and Rules can be read to allow courts *sua sponte* to consider the grounds for non-recognition: Section 5304(b)(5) states only that a foreign judgment "need not be recognized if . . . the judgment conflicts with another final and conclusive judgment." N.Y. CPLR 5304(b)(5). *Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi*, 837 N.Y.S.2d 54 (N.Y. App. Div. 2007), is not to the contrary; it merely assume that the non-movant bears the burden of proving a discretionary basis for non-recognition, *id.* at 56. Further, even if the grounds for non-recognition should be characterized as affirmative defenses, courts may consider certain affirmative defenses, such as res judicata and claim preclusion, *sua sponte. Walters v.*

*Indus. & Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[B]oth the Supreme Court and the Second Circuit have long held that courts may dismiss actions on their own motion in a broad range of circumstances where they are not explicitly authorized to do so by statute or rule."). Petitioners point to no persuasive authority to the contrary. We therefore reject Petitioners' argument.

Finally, Petitioners assert that the District Court abused its discretion when it concluded that the equities favored crediting the Malaysian judgment over the English judgment. We agree with the District Court that equity favors giving heavier weight to the Malaysian judgment—the decision of the primary jurisdiction—over the English, particularly when the English ruling was so closely related to the District Court's own judgment, which had meantime been vacated. We thus conclude that the District Court did not abuse its discretion in its decision denying enforcement.

Accordingly, we affirm the District Court's order denying the petition to enforce the English judgment.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the orders of the District Court.

44